# EXHIBIT A TO BURNS DECLARATION

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY


JOHN MANNING and TONEY           )
QUESENBERRY                      )
                                 )
            Plaintiffs           )   Adv. Pro. No:
                                 )   09-50023
      -vs-                       )
                                 )
DHP HOLDINGS, II,                )
CORPORATION, et al.              )
                                 )
            Defendant            )
                                 )


***

DEPOSITION


DEPONENT:  Craig E. Dean

DATE:  Monday, March 33, 2010

TIME:  1:00 a.m.

PLACE:  919 North Market Street; 17th Floor

          Wilmington, Delaware


REPORTER:  Maureen Misetic, Notary Public


KARASCH & ASSOCIATES
NATIONALLY REGISTERED PROFESSIONAL REPORTERS
(800) 621-5689

1    **A.**    No.

2    **Q.**    No one in the DHP Companies?

3    **A.**    The question is the substance of the

4    litigation, so no.

5    **Q.**    You haven't talked to anyone at the DESA

6    companies about the litigation at all?

7    **A.**    Well, that is a different question.  I have

8    spoken with our assistant chief restructuring officer,

9    Kevin Willis, who is with AEG.  And months ago I spoke

10   with Charlie Schaut, who was the human resource

11   director.

12   **Q.**    Can you tell me what role Mr. Willis has in

13   regard to the DESA companies?

14   **A.**    He is the assistant chief restructuring

15   officer.  His responsibilities are really to assist me

16   in winding up -- to managing the liquidating Chapter 11

17   and winding up the affairs of the company.

18   **Q.**    Tell me how you came to be engaged on this

19   project?

20   **A.**    Originally, we are asked to -- AEG was

21   requested to pitch on the transaction or on the

22   engagement by GE and Terri's, which I think was the

23   successor to Merrill Lynch, as the agent on the

24   transaction, or on the deal.  And we ended up making our

25   pitch to the management team of the company at the time,

1  or I should say some of the senior managers of the

2  company.

3      **Q.**    Do you remember who those senior managers

4  were?

5      **A.**    Kathy Ford, Lance -- I can't remember his

6  last name -- and Glen Hines.

7      **Q.**    Do you remember the timeframe of that pitch

8  to those senior managers?

9      **A.**    It was the week of December -- the week

10  ending December 11, which was a Friday.  So it would

11  have been earlier that week.  I don't recall which day.

12      **Q.**    Help me understand your relationship with GE

13  as the agent on the transaction and why they would have

14  come to you and asked you to make a pitch.

15      **A.**    We have been involved over the years with

16  other engagements that GE has been a lender to, a

17  variety of companies, not unusual for GE when they

18  believe a CRO is needed, as with other financial

19  institutions, to put a list together and say, "We'd like

20  you to interview multiple firms, hire whoever you want,

21  but here is the list."  I believe they did that in this

22  case.

23      **Q.**    Do you know in this case if there were other

24  firms that they asked to make a pitch?

25      **A.**    Yes, there were.

1    **Q.**    What were the other firms?

2    **A.**    I don't know who they were.

3    **Q.**    Before you were actually -- you were

4    ultimately retained as the chief restructuring officer?

5    **A.**    Yes.

6    **Q.**    When did that occur in relation to the week

7    of December 11 pitch to senior management?

8    **A.**    We were retained on December 11.

9    **Q.**    Was that in person or some other contact

10   that would have retained you?

11   **A.**    I'm not sure I understand the question.

12   **Q.**    Let me ask you.  You made a pitch.  I

13   assume -- I shouldn't do that.  Let me ask you, the

14   pitch that you made to the senior managers, was that in

15   person?

16   **A.**    It was on the phone.

17   **Q.**    And that was sometime in the week of

18   December 11.  And I believe your testimony was you were

19   retained on December 11?

20   **A.**    Correct.

21   **Q.**    How did you come to learn that you had been

22   retained?

23   **A.**    We were informed via phone call.

24   **Q.**    Do you remember who called you?

25   **A.**    Glen Hines.

1    **Q.**    Was there anyone else on the phone with Mr.

2  Hines?

3    **A.**    Not to my knowledge.

4    **Q.**    Can you tell me the substance of the

5  conversation that you had with Mr. Hines?

6    **A.**    The only part I remember is they indicated

7  that DESA wanted to retain AEG, and he asked us to put

8  an engagement letter together.

9    **Q.**    And tell me how the relationship developed

10 after that.  Did you ultimately put the retainer

11 agreement together?

12   **A.**    We did.

13   **Q.**    Do you remember when you submitted that to

14 the folks at DESA?

15   **A.**    Almost immediately.  So also the week of

16 December 11.

17   **Q.**    Do you remember who you transmitted that to

18 at DESA?

19   **A.**    I don't recall.

20   **Q.**    Did you, either during the pitch to the

21 senior managers or during your transmittal of the

22 agreement back to them, have any contact at that point

23 with anyone from HIG?

24   **A.**    No.

25   **Q.**    Did you understand at that point that HIG

1   held the DESA Company, the portfolio company?

2       **A.**   Yes.

3               MR. BURNS:  Objection.

4   BY MR. MCCRARY:

5       **Q.**   After you were retained -- I assume there

6   were some drafts of the retainer agreement that went

7   back and forth, or was the version you sent accepted?

8       **A.**   I don't recall.

9       **Q.**   Tell me when you feel like you were retained

10  and on board and everything.

11      **A.**   On December 11.

12      **Q.**   Did you go immediately to work then?

13      **A.**   Yes.

14      **Q.**   Tell me what the first thing you did was?

15      **A.**   On December 11, we went to the company

16  headquarters in Bowling Green, Kentucky and met with

17  senior managers of the firm.

18      **Q.**   When you say "we went" --

19      **A.**   Myself and Kevin Willis of AEG.

20      **Q.**   Was Mr. Willis retained at the same time

21  that you were?

22      **A.**   Correct.

23      **Q.**   Tell me who you met with when you got to

24  Bowling Green?

25      **A.**   The same individuals, Kathy Ford, Glen Hines

1    and Lance Servais.

2       Q.   If you will allow me to back up.  Before

3    making the pitch on December 11, I assume you reviewed

4    certain documents.  You reviewed the posture of the DESA

5    companies; is that fair?

6       A.   My recollection is we were informed of the

7    situation.  I don't recall that we received documents

8    from the company prior to our pitch.

9       Q.   Do you recall who informed you about this

10   situation at the company?

11      A.   I think it was a combination of GE giving,

12   providing us their perspective.  I don't recall how

13   detailed that was at the time, and then this team of

14   individuals that we pitched to as well, the senior

15   managers.

16      Q.   The senior managers gave you some

17   information about the company's situation before the

18   pitch call the week of the 11?

19      A.   Yes, at least Glen Hines did.

20      Q.   Did you speak with anyone at HIG Capital

21   before making the pitch call on the week of December 11?

22      A.   I did not.

23      Q.   Was there anyone -- I think your testimony

24   is clear.  I want to make sure, but is there anyone

25   other than Kathy Ford, Lance Servais that you met with

1 involvement with HIG Capital, if any, to your knowledge.

2 Then I would also, if it's not too much to ask, I would

3 like to also know if they had any involvement in the

4 winding done of the DESA companies, if they were around

5 at that point.

6         The first person on my list is Sami

7 Mnaymneh.  Is that anywhere close to the correct

8 pronunciation?

9     **A.**    I'm sure it isn't.  I try myself.

10     **Q.**    Let me ask about Sami then.

11     **A.**    He was a board member of DESA.  And my

12 interaction with him was related to his board role at

13 DESA.

14     **Q.**    Do you know if he was a member or had any

15 role at HIG Capital?

16     **A.**    I would just be speculating.  So I don't

17 know for a fact.

18     **Q.**    Let me ask you about Anthony Tamer.

19     **A.**    Same also.  Interacted with him as a board

20 member of DESA.

21     **Q.**    Let me ask a follow-up question of Sami.

22 Did he have any executive role at the DESA companies

23 other than board member?  Was there a time when he also

24 served as an executive of the company?

25     **A.**    Not in the time we were involved with DESA.

1    **Q.**   Do you have any knowledge?

2    **A.**   I don't have any knowledge of any time that

3    he was.

4    **Q.**   Let me ask the same thing about Mr. Tamer.

5    **A.**   Same.

6    **Q.**   What about Charles Hanemann?

7    **A.**   Same.  I interacted with Charles as a board

8    member.

9    **Q.**   Richard Stokes?

10   **A.**   Also interacted with Ricky Stokes as a board

11   member.

12   **Q.**   Do you know if either Mr. Hanemann or Mr.

13   Stokes were members of HIG Capital?

14   **A.**   I don't know.

15   **Q.**   What about Brian McMullen?

16   **A.**   Brian, I interacted with him as well, not as

17   a board member, but I believe he was assisting on the

18   calls that I was on.  He was assisting Ricky Stokes on

19   matters that came up.

20   **Q.**   Did you understand Mr. McMullen to be an

21   employee, to be a consultant, have any other role at the

22   DESA companies?

23   **A.**   No.

24   **Q.**   Who did you understand was compensating or

25   employing Mr. McMullen?

1    **A.**    Not to my knowledge.

2    **Q.**    How about Kriz?

3    **A.**    Michael Kriz is an individual -- he was the

4    point person at GE that we were working with on this

5    engagement.

6    **Q.**    GE was a senior lender to the DESA

7    companies; is that fair?

8    **A.**    Correct.

9    **Q.**    Is Michael Kriz someone that you spoke with

10   before making the pitch with senior management?

11   **A.**    Yes.

12   **Q.**    He is one of the people at GE who asked you

13   to make the pitch?

14   **A.**    Correct.

15   **Q.**    You may have testified to this, if you did I

16   apologize for asking it again, but can you tell me how

17   many projects you worked with Michael Kriz in the past?

18   **A.**    This is the first I worked with Michael.

19   **Q.**    Mr. Kriz, to your knowledge, did he have any

20   employment or agreement or is he a member of HIG

21   Capital?

22   **A.**    Not to my knowledge.

23   **Q.**    How about David Miller?

24   **A.**    David Miller was the individual at McQuiry

25   who served as the adviser of the senior lenders for a

1  member of HIG Capital?

2      **A.**    I don't have knowledge of that.

3      **Q.**    What about Doug Vermin?

4      **A.**    I had no interaction with Doug Vermin.

5      **Q.**    Let me ask this question to make sure I

6  understand.  You had no interaction with Bulduc or

7  Vermin.  Do you know whether Vermin or Bulduc had any

8  involvement in the DESA companies during the time that

9  you were there?

10     **A.**    I never saw any involvement by either of

11 them with the companies while I was there.

12     **Q.**    Can you tell me during your time with the

13 DESA companies, how much contact you had with anyone

14 from HIG Capital?

15     **A.**    Our involvement, or my investment, would

16 have been with board members, either in or during board

17 meetings, of which they were limited in number.

18     **Q.**    Did you attend all of the board meetings?

19     **A.**    I can't speak of that.  I would have during

20 that period of time.  To my knowledge, after we were

21 retained, I attended part or all of the board meetings

22 after that.  And periodically, I would keep Ricky Stokes

23 informed of my activities and actions and developments

24 at DESA.

25     **Q.**    Can you tell me what is the purpose of

1  keeping Ricky Stokes informed?

2      **A.**   I assumed he was the point person for the

3  board.  So to the extent that he was really the point

4  person for me to interact with on the board outside of

5  board meetings.

6      **Q.**   Can you tell me what gave you the impression

7  that he was the point person for the board?

8      **A.**   I think it started with, he was the one that

9  reached out to me first from DESA, or rather from HIG,

10 or that I connected with first from the board.  Let me

11 clarify it, from the board, it was Ricky.

12     **Q.**   Do you recall when it was that he reached

13 out to you?

14     **A.**   I do recall.  We first spoke on December 12.

15     **Q.**   That was Ricky reaching out to you on

16 December 12?

17     **A.**   We were trading calls.  I am not 100 percent

18 sure.

19     **Q.**   Did any of the other board members reach out

20 to you?

21     **A.**   No.

22     **Q.**   Ricky Stokes is the only board member who

23 you kept informed or had contact with outside of regular

24 board meetings?

25     **A.**   He is the only board member I kept -- yes,

1  kept informed or had regular discussions with, yes.

2  Periodic discussions is a better description.

3      Q.   Can you tell me what your definition of

4  periodic is?

5      A.   I am sure it varied during the case, but

6  maybe monthly.

7      Q.   Sometimes more or and sometimes less?

8      A.   It was more frequent at the beginning, as

9  these cases typically would be, and slowed down over

10  time.

11      Q.   Did Mr. Stokes -- you would keep him

12  informed of what you were doing at the DESA company.

13  Did Mr. Stokes bring to you suggestions that were from

14  the board, or was it a one-way street, you giving Mr.

15  Stokes information?

16      A.   It was primarily a one-way street.  I can't

17  say he never offered an opinion, but it was primarily me

18  keeping him posted.

19      Q.   Did he tell you that that was something that

20  the board had asked him to do?

21      A.   I don't recall.

22      Q.   Tell me, if you can, what types of

23  information you would give Mr. Stokes to keep him

24  informed.

25      A.   Matters that would be -- I think are public

1    record from the case, things like we are running a

2    process to sell certain businesses within DESA, and this

3    is the process that we are going to follow.  This is our

4    expectation of how this will work out, how long it might

5    take, what kind of proceeds that might expect.  That

6    sort of thing.

7         Q.    Did you feel like you had some duty to

8    inform Mr. Stokes or to share this information with him?

9         A.    In the sense that as the senior officer, you

10   report to a board, yes, in terms of keeping the board

11   informed.

12        Q.    That at times that means only reporting to

13   one member of the board?

14        A.    In interim periods, yes.  Meaning, between

15   board meetings.

16        Q.    I think you provided testimony to this, but

17   my memory is poor today, let me make sure.  During the

18   time that you were reporting to Ricky Stokes and he was

19   a member of the board, did he hold any management

20   position with the DESA companies?

21        A.    No, he didn't.  Not to my --

22              MR. GROHSGAL:  To your knowledge; is that

23              what you are saying?

24              THE WITNESS:  I believe I would have known

25              management positions, so he didn't.

1    **Q.**   Can you tell me what you know about that one

2   time?

3    **A.**   My understanding is it was a $15 million

4   subordinated loan subordinated to the senior member

5   lender group of $15 million.

6    **Q.**   Do you recall the timeframe of the loan?

7    **A.**   I believe is was the spring of 2008.

8    **Q.**   Was HIG, to your knowledge, were they ever

9   hired under a management services contract to perform

10   specific management services, responsibilities to the

11   DESA companies?

12    **A.**   Not to my knowledge.

13    **Q.**   At the time that you arrived at the DESA

14   company, was HIG performing any management services?

15    **A.**   No.

16    **Q.**   Throughout your tenure there, did you ever

17   see HIG perform management services?

18    **A.**   No.

19    **Q.**   Who is it at the DESA company that would

20   have negotiated, would have been be in charge of or

21   tasked with the responsibility of negotiating specific

22   employment contracts or bonus agreements to employees at

23   the level of Mike Briggs and Kathy Ford?

24    **A.**   I don't know the answer to that question.

25    **Q.**   Did you, yourself, ever negotiate any

1  employment contracts or bonus structures with employees

2  at that executive level?

3     **A.**   Yes.

4     **Q.**   Who did you negotiate that with?

5     **A.**   Well, who did I negotiate them with?  I

6  guess I negotiated them with myself and informed the

7  board that this is what we want -- what we intended to

8  do, but they needed to be approved by the bankruptcy

9  court.

10    **Q.**   Any recommendations that you made to pay

11 professionals or executives was after the bankruptcy

12 filing?

13    **A.**   Yes.

14    **Q.**   Is it a matter that you took to the board

15 for approval before asking the court?

16    **A.**   No.

17    **Q.**   If you had negotiated employment agreements

18 or bonus plans or payments with employees at the level

19 of Mike Briggs, Kathy Ford, outside the context of a

20 bankrupt filing, is that something that you feel like as

21 chief restructuring officer or as an executive of the

22 DESA companies, it would have been within your purview

23 to do exclusively or would you need board approval?

24             MR. GROHSGAL:  I object to the form of the

25             question.  It's a completely hypothetical

1    question.

2         MR. MCCRARY:  If you can answer it.

3         MR. GROHSGAL:  I'm not even clear what

4         company you are talking about.

5         MR. MCCRARY:  The DESA companies.

6         THE WITNESS:  Well, based upon the

7         retention agreement that we had, that AEG had,

8         and my role as CRO, I don't think it would

9         require approval from any other parties.

10   BY MR. MCCRARY:

11   Q.   I think we covered it, but for the sake of

12   completeness, let me ask one more time, did you have

13   contact with anyone at HIG, other than HIG members who

14   were also on the board or the one person that we talked

15   about today, Mr. McMullen, was there anyone else during

16   your tenure?

17   A.   There were occasional administrative matters

18   that would have been forwarded by an assistant of

19   Ricky's or somebody in his group or somebody else

20   working with the board members, but that is the only

21   thing I can recall.

22   Q.   Can you give me an example of what those

23   administrative matters might be?

24   A.   One that I recall is there was a bill for

25   payment of the data site over in Europe to sell the

1 company.  The bill had gone to Ricky's attention, HIG or

2 somebody's attention at HIG, and they forwarded it on

3 and asked us to follow up.

4    **Q.**    During your time at the DESA companies, did

5 you make any changes to the employee handbook or the

6 human resources policies book or whatever such a thing

7 would be called at the DESA companies?

8    **A.**    No.

9    **Q.**    When was the decision made to file for

10 bankruptcy?

11    **A.**    Late December of 2008.  I don't recall the

12 exact date, but it was, I believe we filed on the 29th.

13 So it would have been a matter of days before that that

14 the decision was made.

15    **Q.**    Tell me in your estimation, what were the,

16 at the time you arrived at the DESA companies on the

17 13th, I think it was --

18    **A.**    The 11.

19    **Q.**    -- what options were on the table for the

20 DESA company going forward as you saw them?

21    **A.**    They were very limited.  The company had --

22 the banks had already frozen the company's bank

23 accounts, so it was very difficult to function in any

24 capacity without the ability to make payroll and pay

25 vendors and that sort of thing.

1          It was quite limited at that point, Chapter

2    11, there's multiple ways to wind down a company.  It

3    doesn't need to be done through a chapter process.  So

4    we probably looked at those alternatives at the time.

5    And one of the options presumably would have been to

6    have the senior lenders support the company going

7    forward.  There was limited willingness to do that, I

8    believe.

9         **Q.**   Was that an option that was explored?  Did

10   you reach out to the senior members?

11        **A.**   I'm sure it was discussed.

12        **Q.**   Was that something that would have been in

13   your purview of chief restructuring officer?

14        **A.**   Yes.

15        **Q.**   Would it have been you personally who was

16   reaching out to the senior lenders trying to negotiate

17   such things?

18        **A.**   Yes.

19        **Q.**   That was done in this case?

20        **A.**   Yes, I know we had those conversations.

21        **Q.**   Would you have reached out to any of the

22   subordinate lenders, or was it of no use to do that

23   until you got some deal with the senior lenders?

24        **A.**   That is an accurate characterization.

25   Without the support of the senior lenders, the rest of

1  the capital constituents didn't make too much

2  difference.

3      **Q.**   In this case, was it, in fact, that

4  situation where you never got far enough along to reach

5  out to the subordinate lenders?  Or did you just to see

6  if they wanted to play if you can get the senior lenders

7  on board.

8      **A.**   We didn't get that far.

9      **Q.**   Let me ask you about the decision to

10  terminate the employees.

11     **A.**   Okay.

12     **Q.**   Do you remember when that decision was made?

13     **A.**   Well, I think there were a variety of

14  termination dates.

15     **Q.**   Can you take me through the first

16  termination date and then through the others and give me

17  the rational as you understand it why there were various

18  dates?

19     **A.**   Let me give you the key items I remember.

20  When we first got there, because we didn't have the

21  ability to -- because the accounts were frozen, I think

22  we elected to have a smaller staff and see if we can

23  convince the lenders to support some limited payroll

24  while we determined what the options were for the

25  company.  So that was probably the first reduction that

1  we implemented very early on, probably immediately after

2  the 11th or shortly thereafter.  And then the major

3  termination that we did of a large share of employees

4  was on the 21st of December.

5      **Q.**    And then there were some terminations after

6  that?

7      **A.**    There were terminations after that as we --

8  the employees were brought back to do various things

9  over the wind down of the -- the wind down of the

10  company or sale of the businesses.  So that stretched

11  out over a number of months.

12      **Q.**    Did any employees ever terminate after

13  December -- is it your testimony employees terminated

14  after December 21 would have been employees who were

15  kept on in whatever capacity to help with the wind down,

16  but at that point the company was winding down and was

17  not going to exist as a going concern?

18      **A.**    I don't recall the exact date, but if that

19  decision was made, it would have been in that general

20  timeframe, but we did restart certain of the businesses,

21  and some of those -- at least one of those businesses

22  was sold as a going concern.  And all those, most of

23  those employees were retained by the buyer.  So it was

24  really a mixed outcome depending on which segment of the

25  business the employees were in.

1          terminate, properly terminate, the insurance

2          coverage.  Also, there could not be any union

3          employees at the company at that time.

4              So I think that was one of the reasons we

5          took the decision on the 21st to terminate a

6          large group of employees, a large group of

7          union employees.  In Bowling Green, there are

8          two different union agreements, and it did

9          relate to allowing us to officially terminate

10          the insurance coverage.

11  BY MR. MCCRARY:

12     Q.   Let me now ask about the two, while not very

13  specific events, at least somewhat specific events, the

14  11th or thereafter terminations and then the one from

15  the 21st.

16          The terminations or employee reductions on

17  the 11th or thereafter, can you tell me who all

18  participated in the decision to make those employee

19  reductions?

20     A.   To the extent there were employee reductions

21  around that date, there was myself, Kevin Willis and the

22  senior managers at the company, which would have been

23  Kathy Ford, Lance, perhaps Angela Aldridge.

24     Q.   Were the terminations of the employee

25  reductions an item of business that you could decided

1  yourself, or was it something you had to make

2  recommendation to the board and get board approval on

3  first before effectuating?

4      **A.**   My retention contract put hiring and firing

5  decisions in my purview as CRO.

6      **Q.**   So you had the authority under your

7  contract?

8      **A.**   Correct.

9      **Q.**   Did you exercise that yourself or did you

10  check with other --

11      **A.**   I did exercise it.

12      **Q.**   Did you have any conversation whatsoever

13  with any board member before exercising your discretion

14  to make that call?

15      **A.**   With regard to the discussions?

16      **Q.**   The December 11 or thereafter terminations.

17      **A.**   I don't believe I did.

18      **Q.**   Do you know whether it would have been a

19  topic of discussion in one of informational telephone

20  calls or meetings with Ricky Stokes?

21      **A.**   It may have been.

22      **Q.**   Can I take that answer as you don't have a

23  specific recollection?

24      **A.**   I don't.  My recollection is more that we

25  were focussed on other issues that were -- I don't

1          think you're asking him a question that I would

2          have trouble answering.  If you wanted to say

3          the ones that happened on about the 21st, I

4          think that clears up my concern.

5               MR. MCCRARY:  Okay.  And anytime that you

6          don't understand the question I am asking,

7          don't answer it.  Just ask me to rephrase it.

8          If I ask it poorly, I will ask it again.

9     BY MR. MCCRARY:

10         **Q.**   December 21 reductions, who participated in

11    the decision to make those?

12         **A.**   The decision, again, was mine.  I believe

13    that Kevin Willis, assistant CRO, would have

14    participated.  Some set of the senior managers would

15    have been part of this discussion, Kathy Ford.

16               (A brief recess was taken.)

17               THE WITNESS:  So I think I answered who

18          participated in the decision to make those,

19          myself, Kevin Willis, Kathy Ford.

20    BY MR. MCCRARY:

21         **Q.**   Any other people beyond that?

22         **A.**   The way -- no.

23         **Q.**   Can you tell me if you, and again I don't

24    want you to divulge the substance of any conversations

25    you had with any of your counsel, can you tell me for

1          MR. BROWN:  You can go ahead and answer

2      that question.

3          THE WITNESS:  No.

4  BY MR. MCCRARY:

5      **Q.**  Let me ask you about the provision of WARN

6  notices to employees.  Do you have some knowledge

7  concerning that?

8      **A.**  Yes.

9      **Q.**  Can you tell me about the drafting of the

10  WARN notice to employees, who participated in that?

11      **A.**  The group that participated would include

12  myself, Kevin Willis, Charles Schaut, counsel.

13      **Q.**  Do you recall when the drafting of the

14  notices began?

15      **A.**  Shortly after the 11th, when we were

16  retained.  It may have been the 11th.

17      **Q.**  In any event, within a matter of days?

18      **A.**  Yes.

19      **Q.**  Do you have some knowledge about when the

20  WARN notices were distributed?

21          MR. BROWN:  I am getting a little concerned

22      that you can ask these questions in a much more

23      narrow way without impinging on phase II of

24      this litigation.

25          MR. MCCRARY:  I am trying not to lead the

1    BY MR. MCCRARY:

2        Q.   Other than counsel, Kevin Willis, Charlie

3    Schaut, is there anyone else you consulted with

4    concerning either the drafting or the provision of WARN

5    notices?

6        A.   Not that I recall.

7        Q.   Any conversation at all with the board about

8    those two subjects?

9        A.   Can you clarify the question?

10       Q.   Did you ever discuss the drafting of WARN

11   notices with the board?

12       A.   No, I didn't discuss the drafting of WARN

13   notices with the board.

14       Q.   Did you ever discuss the provision of WARN

15   notices to employees with the board?

16       A.   Can you clarify provision of WARN notices?

17       Q.   Did you ever talk to the board about

18   providing employees with notices?

19       A.   Yes.

20       Q.   Was it a subject that was discussed with the

21   board at an official board meeting, or was it in a

22   meeting similar to the ones you testified you would have

23   by telephone with Mr. Stokes?

24       A.   The latter.

25       Q.   You would have advised Mr. Stokes in a

1  earlier, by Ricky to me asking if those -- what the

2  company's intent was with regard to WARN notices.  WARN

3  notices may have already been sent at that point.  I

4  can't recall when that conversation occurred.

5      **Q.**  Is it fair for me to assume, if I understood

6  your testimony correctly, the informal conversation with

7  Ricky Stokes regarding the December 21 layoffs is the

8  same conversation regarding WARN notices that you

9  provided testimony about?  Or did you have multiple

10  conversations with Mr. Stokes about these subjects?

11      **A.**  It may have been more than one conversation.

12  I don't recall.

13                  (A brief recess was taken.)

14  BY MR. MCCRARY:

15      **Q.**  There were a number of documents signed by

16  you, an affidavit and statement of financial affairs in

17  conjunction with the first date filings in the

18  bankruptcy court.

19      **A.**  Yes.

20      **Q.**  You signed those documents and swore they

21  were true to the best of your knowledge and belief at

22  the time.  Has your knowledge and belief changed at all

23  from the time of filing and signing of those documents

24  to now that I would need to know about?

25      **A.**  No.

1      MR. MCCRARY:  I don't have any more

2      questions for the witness today.  I'd like to

3      reserve questions based on Ken's instruction to

4      the witness not to answer certain questions.

5      Nothing else for today.

6                - - - -

7   BY MR. BURNS:

8      Q.   During the time period from which you were

9   retained by the DESA companies until the petition for

10  bankruptcy was filed, I believe that was December 11,

11  2008 until December 29, 2008, during that time period

12  who was running the DESA Company on a day-to-day basis?

13     A.   I was.

14     Q.   Was anyone else running it with you?

15     A.   My assistant CRO who was in an executive

16  role.  That was all.

17     Q.   And during this same time period, who was

18  directing the employees on a day-to-day basis on what

19  jobs they should be doing or responsibilities they

20  should be fulfilling?

21     A.   I was, or my direct staff.

22     Q.   Did anyone from HIG play any role in

23  directing the employees during this time period to what

24  they should be doing?

25     A.   No.

1   **Q.**   During this time period, were you
2   communicating with senior lenders as to --

3   **A.**   Yes.   Sorry.   I didn't know you weren't
4   done.

5   **Q.**   At some point were you authorized to file a
6   bankruptcy petition on behalf of the DESA companies?

7   **A.**   Yes.

8   **Q.**   Do you know who signed the bankruptcy
9   petition?

10   **A.**   I don't recall, but it was probably me.

11   **Q.**   Was anyone from HIG responsible for the
12   running of the company, of the DESA companies, on a
13   day-to-day basis during the time period December 11 to
14   December 29, 2008?

15   **A.**   No.

16              MR. BURNS:   I have no further questions.

17              (Deposition concluded at 3:27 p.m.)

18                   - - - -

19

20

21

22

23

24

25