# EXHIBIT B TO BURNS DECLARATION

THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

CHAPTER 11
CASE NO. 08-13422 (MFW)
(Jointly Administered)

**CERTIFIED COPY**

In re:
DHP HOLDINGS II CORPORATION, et al.,
           Debtor,

_____

JOHN MANNING, KEN MAITLAND and TONY QUESENBERRY
on their own behalf and on behalf of other persons
similarly situated,

           Plaintiffs,
      vs
DHP HOLDINGS II CORPORATION, a/k/a
DESA (CAYMAN) HOLDING, LLC,
DESA (CAYMAN) II HOLDING, LLC,
DESA, LLC,
DESA HEATING, LLC,
DESA SPECIALTY, LLC
DESA FMI, LLC,
DESA IP, LLC
DESA, LLC, and
HIG CAPITAL, LLC,

           Defendants.
_____/

DEPOSITION OF RICHARD STOKES
     Taken before Michele L. Savoy, RPR and Notary
Public in and for the State of Florida at large,
pursuant to Notice of Taking Deposition filed by the
Plaintiffs in the above cause.
 Friday, March 26, 2010
 1221 Brickell Avenue, 27th floor
 Miami, Florida 33130

1      **Q**   **Is that a yes, it's accurate?**

2      A   I don't have any reason to believe it

3 isn't accurate.

4         MR. TUFTS:  All right.  I would like to

5     admit this document on -- what is it marked as?

6         THE COURT REPORTER:  Plaintiff's 1.

7         MR. TUFTS:  Plaintiff's 1.

8 BY MR. TUFTS:

9      **Q**   **Is it fair to say that Defendant H.I.G.**

10 **Capital, LLC owned the DESA or debtor entities in**

11 **2008?**

12      A   Affiliated funds of H.I.G. Capital, LLC

13 were majority investors in the parent companies to

14 DESA.

15      **Q**   **Okay.**

16              **(Thereupon, a document was**

17              **marked as Plaintiff's Exhibit No. 2**

18              **for Identification.)**

19 **BY MR. TUFTS:**

20      **Q**   **Mr. Stokes, do you recognize this**

21 **document?**

22      A   I do.

23      **Q**   **What is it?**

24      A   It is a credit agreement that was entered

25 into on June 11th, 2007.

1     **Q    Okay.  Will you flip to the page that is**

2    **Bates labeled DHP-000087.**

3     A    Yes.

4     **Q    Whose signature is that?**

5     A    Sami Mnaymneh.

6     **Q    And does that --**

7         MR. DAVIS:  Spell it for her.

8         THE WITNESS:  M-N-A-Y-M-N-E-H.

9    BY MR. TUFTS:

10    **Q    Okay.  I would like to direct your**

11   **attention to the page marked DHP-000105.**

12         **Do you recognize this document?**

13    A    I do.

14    **Q    What is it?**

15    A    It's an intercreditor agreement as part of

16   the June 11th, 2007 credit agreement.

17    **Q    Between who?**

18    A    Between H.I.G. Capital Partners III, LP;

19   H.I.G. Investment Group II, LP; H.I.G. Partners II,

20   LP; H.I.G. Investment Group III, LP; Berggruen

21   Holdings North America; and DESA, LLC, and various

22   related DESA entities.

23    **Q    Okay.  Towards the bottom of that**

24   **paragraph do you see the name Merrill Lynch?**

25    A    Do I see that?  Yes.

1      Q    Who is Merrill Lynch and were they a party

2  to this agreement?

3      A    Yes.  Merrill Lynch was the agent for a

4  senior credit facility that was held by DESA.

5      Q    All right.  I would like to direct your

6  attention to page HIP-000128 and the following page,

7  129.

8      A    Yes.

9      Q    Is that your signature?

10     A    It is.

11     Q    Okay.  And you were signing on behalf of

12  DESA?

13     A    On behalf of various DESA entities listed

14  here, yes.

15     Q    Okay.  I would like to direct your

16  attention back to the credit agreement.  What was

17  the original loan amount under this credit

18  agreement?

19     A    Ten million dollars.

20     Q    Okay.  Were there any additional amounts

21  lent under the same agreement?

22     A    There was an amendment to this agreement

23  in March -- roughly March of 2008 which increased

24  the loan amount by five million dollars.

25     Q    What was the original interest rate under

1    BY MR. TUFTS:

2        **Q    What is the total indebtedness of DESA to**

3    **H.I.G. under the subordinated credit agreement as of**

4    **September 19, 2008?**

5        A    The principal amount, the original face

6    principal amount was a total of 15 million dollars

7    under the credit facility.  The H.I.G. affiliated

8    funds was entitled to 70 percent of that.

9        **Q    Who is entitled to the other 30 percent?**

10       A    Berggruen Holdings, and there was accrued

11   and unpaid interest, the balance of which I do not

12   know.

13       **Q    At the time the credit agreement was**

14   **entered into, this subordinated credit agreement,**

15   **who sat on the board of directors at DESA?**

16       A    At which entity?

17       **Q    DHP Holdings II, Corporation; DESA, LLC;**

18   **DESA FMI, LLC; DESA Speciality; DESA IP; DESA**

19   **Heating.**

20           **Did I leave any out?**

21       A    As to DHP Holdings II, Corporation,

22   myself, Tony Tamer, Sami Mnaymneh, Charles Hanemann,

23   and Jared Bluestein.

24           As to the others, I do not know -- do not

25   recall.

1    the divestiture of our heat unit business and the

2    divestiture of the our international operation, as

3    well as the various refinancings that took place as

4    part of the amendments with our CO letters.

5        **Q    So you were functioning as an officer**

6    **spearheading these various actions you just**

7    **described?**

8        A    I would not say that these activities were

9    run by the day-to-day managers of the business, and

10   we provided oversight and advisory level guidance as

11   it related to those transactions.

12       **Q    Did you have the authority to veto any of**

13   **the actions taken by the other DESA officers you**

14   **just referred to?**

15           MR. DAVIS:  Objection.  Calls for a legal

16       conclusion.

17   BY MR. TUFTS:

18       **Q    You can answer the question.**

19           MR. DAVIS:  To the extent you can answer

20       it without divulging any attorney-client

21       privilege information.

22       A    I don't possess any veto power.

23   BY MR. TUFTS:

24       **Q    Okay.**

25       A    The company is managed by a board of

1  directors that I am a member of.

2  **Q    Okay.  When you say you provided**

3  **oversight, what did you mean by that?**

4  A    Helping to provide guidance in terms of

5  managing the sale process, which for significant M&A

6  activities is really outside of the ordinary course

7  of business that the executives that ran DESA are

8  familiar with and have experience with.

9  So we helped to provide some insight in

10  terms of how those processes work; provided some

11  insight in terms of how to present these businesses

12  to potential buyers; provided insight in terms of,

13  again, how to manage the process, broadly speaking.

14  **Q    Okay.  So you were doing things for DESA**

15  **that DESA's officers couldn't do for themselves?**

16  A    The day-to-day managers of DESA, the CEO,

17  the CFO, the various other executives, their core

18  skill set is managing manufacturing businesses and

19  selling their various manufactured products and

20  overseeing the facilities in the operations and the

21  procurement of materials and the procurement of

22  customers and the management of customer

23  relationships.  That is their core skill and their

24  core competency.

25  What is not part of their core competency

1  is managing an acquisition or divestiture process.

2  That activity is board-level involvement in those

3  types of activities.

4         Mergers and acquisitions and major

5  financings are something that many of the board

6  members have significant experience in, and that is

7  an area where we felt we could be helpful in

8  maximizing and creating value and providing guidance

9  and assistance to the management team at the company

10 in executing transactions like this.

11        **Q    Are there any other duties you performed**

12 **as an officer that you haven't already addressed?**

13        A    At a board level, we certainly endeavored

14 to provide strategic direction to the business.

15        **Q    Okay.  Did you have, while you were an**

16 **officer at DESA, did you have a DESA email address?**

17        A    I did not.

18        **Q    Did you ever use or how did you -- if you**

19 **didn't have an email address with DESA, what email**

20 **address did you use when you were mailing on behalf**

21 **of DESA as an officer?**

22        A    H.I.G. Capital email address.

23        **Q    Okay.  Did you have an office at any DESA**

24 **facility?**

25        A    No.

1    Q    Where did you perform your duties as an

2  officer for DESA then?

3    A    My office is located in Miami, Florida,

4  and it is from there that we -- I provided my

5  board-level involvement.

6    Q    Okay.  How about when you were providing

7  services as an officer of DESA?

8    A    Also from my Miami office.

9    Q    Okay.  And that Miami office, is that

10  where you worked for H.I.G. Capital?

11    A    Yes, it is.

12    Q    Okay.  When you were performing duties as

13  an officer for DESA out of your H.I.G. office in

14  Miami, did DESA pay for any overhead such as

15  supplies, computers, Internet service fees,

16  telephone service fees, rent, anything like that?

17    A    No.  We were reimbursed for out-of-pocket

18  expenses from things like travel and direct

19  out-of-pocket expenses, but, no, no overhead.

20    Q    No supplies, no computers, Internet

21  access?

22    A    No.

23    Q    None of the things I just mentioned?

24    A    Correct.

25    Q    Did you have a telephone number at any

1  management team as to the performance of the

2  business and the status of -- you know, various

3  day-to-day initiatives that they were managing.

4      **Q     And Mr. McMullin did not sitting on the**

5  **board of directors of DESA?**

6      A     No.

7      **Q     And no other junior analyst from H.I.G.**

8  **sat on the board of directors of DESA?**

9      A     No.

10     **Q     You mentioned a management team.  Who was**

11 **on this management team?**

12     A     At what time?

13     **Q     Any time during 2008.**

14     A     Mike Briggs was the chief executive

15 officer and our key point of contact.

16     **Q     Anyone else on the management team?**

17     A     We interacted with the chief financial

18 officer and other members of the finance staff as

19 well as the presidents of the various divisions and

20 other senior members of the management team --

21     **Q     Okay.**

22     A     -- attended -- attended those meetings,

23 some of those meetings.

24     **Q     I apologize for speaking over you.**

25         **Who is the CFO at the time of these -- or**

1    at the time that you visited these management teams

2    at Bowling Green?

3        A    What time period?

4        Q    Any time during 2008.

5        A    Paul Lehmann as the chief financial

6    officer.  I believe he resigned at some point in

7    2008.  I can't -- I can't recall the exact date.

8        Q    And who was on the financial staff or the

9    finance staff that you mentioned earlier?

10        A    Kathy Ford.

11        Q    Okay.  How frequently did you visit, or

12    any of the individuals that you named earlier, visit

13    the Bowling Green facility during 2008?

14        A    I can't recall the exact number of

15    meetings during that time frame, but sometimes we --

16    several times a year.

17        Q    Okay.  If you had to give an estimate,

18    what would that estimate be?

19        A    I don't have an estimate.

20        Q    Once a quarter at least?

21        A    I would say once a quarter is probably a

22    fair estimate.

23            MR. TUFTS:  Would you like to take a break

24        now?

25            MR. DAVIS:  Sure, we can take a break.

1     A    I don't recall that any of his input or

2  facts were needed, but having him there was

3  potentially helpful in ensuring that we had the

4  right facts and information as we discussed these

5  things.

6     **Q    Why did you believe that he had facts and**

7  **information necessary to support the board of**

8  **directors?**

9     A    As discussed before, he worked in a

10  support role with us to analyze various

11  transactions, support certain M&A processes and

12  procedures and financing processes and procedures.

13     **Q    Did Mr. McMullen provide any information**

14  **at that meeting regarding employees at DESA?**

15     A    To my recollection, no.

16     **Q    But -- I'm sorry, and I don't mean to**

17  **characterize your earlier testimony.  You don't**

18  **recall what information, if any, he did provide at**

19  **that meeting; is that correct?**

20     A    That is correct.

21     **Q    Okay.  Is there anything inaccurate or**

22  **incorrectly stated in these minutes?**

23     A    To my knowledge, no.

24     **Q    Did the board of directors vote on the**

25  **provision of WARN act notices?**

1      A      Did we vote on the provision of WARN act

2  notices?

3      Q      Yes.

4      A      No.

5      Q      Ever?

6      A      Correct.

7      Q      Not just this meeting?

8      A      Correct.

9      Q      Was there a second board of directors held

10 on December 15, 2008, either before this one or

11 after this one?

12     A      To my knowledge and recollection, no.

13     Q      I would like to turn your attention to the

14 last page marked DHP-000003, specifically the last

15 five paragraphs.  It says that Mr.Dean stated that

16 WARN act notices were sent in Kentucky.

17          Do you see that?

18     A      Mhm-mhm.

19     Q      You see the next paragraph says,

20 "Throughout each presentation, the board members

21 asked questions requesting further detail and

22 discussed various ideas for preserving the company's

23 value."

24          Do you see that?

25     A      Yes.

1    Q    Did I read that correctly?

2    A    Yes, you did.

3    Q    Do you recall what questions were asked by

4    the board of directors?

5    A    I don't recall the specific questions.

6    Q    Do you recall generally what the questions

7    were about?

8    A    Any alternatives that might be available

9    to the company, the process that the company went

10   through to ensure that no other alternatives were

11   available.

12   Q    Alternatives to what?

13        I'm sorry.  I didn't mean to talk over

14   you.  I apologize.  Go ahead and finish.

15        Alternatives to what?

16   A    Filing for bankruptcy.

17   Q    Okay.  Did the board ask any questions

18   about the provision of WARN act notices?

19   A    To my recollection, no, not specifically.

20   Q    Okay.  I would like to direct your

21   attention to the second paragraph on that page, the

22   one between -- one of the two between the two

23   redacted sections.  The second of the two.

24        "The board was appointed -- or the board

25   also appointed Craig Dean as the Chief Restructuring

1   Officer of each of the above referenced entities."

2        A     Yes.

3        Q     Did you vote to appoint Craig Dean as

4   chief restructuring officer?

5        A     Yes.

6        Q     Did the other members present also vote to

7   appoint Craig Dean as the chief restructuring

8   officer of DESA?

9        A     Yes.

10       Q     Was there any dissent?

11       A     To my recollection, no.

12       Q     Prior to December 15th, had Mr. Dean

13   performed any duties as a chief restructuring

14   officer on behalf of DESA?

15       A     I don't know.

16       Q     Do you recall who initially solicited a

17   bid from AEG to perform restructuring services for

18   DESA?

19       A     The senior lenders provided the company a

20   list of -- I believe it was four advisory firms that

21   were acceptable to them.  The company reviewed

22   background information that was provided on each and

23   selected two to interview.

24            And the company, the management team of

25   the company interviewed each and ultimately selected

1   and recommended AEG partners for the assignment.

2       Q    Okay.  Do you recall specifically who in

3   the management team interviewed Mr. Dean?

4       A    I don't know what specific people

5   interviewed him, no.

6       Q    Okay.  But you believe it was the

7   management team at DESA?

8       A    To my recollection, Kathy Ford interviewed

9   them.  And I can't recall the other individuals who

10  actually conducted the interviews.

11      Q    Do you recall when Ms. Ford interviewed

12  Mr. Dean?

13      A    I can't recall the specific date, no.

14      Q    Do you know if it was definitely before

15  this meeting with the board of directors?

16      A    Yes.

17      Q    But you don't recall whether or not

18  Mr. Dean performed any services for DESA prior to

19  being appointed as chief restructuring officer at

20  this meeting, this December 15th of 2008 meeting?

21      A    I don't have knowledge of that.  I know

22  only that he was formally appointed at this meeting.

23      Q    Did you ever have any discussions with

24  Mr. Dean?

25      A    Yes.

1    Q    Do you recall any specific instances where

2  you had communications with Mr. Dean?

3    A    In his normal course of duties, he kept me

4  and the board of directors apprised of what he was

5  doing.

6    Q    Do you recall when you first spoke or

7  communicated with Mr. Dean?

8    A    I don't recall the first conversation, no.

9    Q    Was it before or after this December 15th,

10  2008 meeting?

11    A    I don't recall.

12    Q    When you spoke to Mr. Dean or communicated

13  with Mr. Dean, was it always in the presence of the

14  other members of the board of directors of DESA?

15    A    No.

16    Q    Do you recall what you discussed with

17  Mr. Dean in those instances where the other members

18  of the board of directors of DESA were not present?

19    A    Generally just providing updates to me in

20  terms of actions that he had taken and --

21    Q    Okay.  When you had communication or

22  communications with Mr. Dean outside of the presence

23  of the other members of the board of directors of

24  DESA, would these communications take place by

25  telephone, by email?  What was the method or manner

1    "Mr. Stokes moved for the board to ratify the

2    termination of health plans."

3            Did I read that correct?

4    A    Yes.

5    Q    What health plans were you referring to?

6    A    Certain health plans of the company, of

7    DESA.

8    Q    DESA employees?

9    A    Yes.

10   Q    Were there any resolutions that were

11   adopted during this meeting?

12   A    I don't specifically recall.

13   Q    I would like to direct your attention to

14   the sentence after the one I just read to you:  "Mr.

15   Hanemann seconded the motion."

16           Did I read that correctly?

17   A    That's what this says, yes.

18   Q    Did any of the other members of the board

19   of directors object or dissent from your motion?

20   A    It says here the directors voted

21   unanimously to ratify the termination.

22   Q    Well, let me ask you this.  Before they

23   voted, was there any discussion about whether or not

24   those benefits should be terminated?

25   A    We were advised by Craig Dean in summary

1   that the bank -- the lenders refused to continue

2   incurring liabilities under the health plan, and,

3   therefore, Mr. Dean recommended that the plan was

4   terminated and that the employees were informed so

5   that no additional liabilities would be incurred.

6       **Q    Now, did Mr. Dean make that recommendation**

7   **before you made the motion?**

8       A    Yes.

9       **Q    Between the time you made the motion at**

10  **the time the board unanimously voted on it, was**

11  **there any dissent or any discussion about**

12  **termination of the benefits?**

13      A    Can you repeat the question?

14      **Q    Sure.**

15      **Between the time you moved the board to**

16  **ratify the termination of the health plans and the**

17  **time that the directors unanimously voted to ratify**

18  **the termination, was there any discussion about the**

19  **termination of the health benefits?**

20      A    No.  The update on the benefit was given

21  prior to the motion.

22      **Q    So the directors didn't discuss it any**

23  **further?**

24      A    It was discussed prior to bringing the

25  actual motion.

1  **Q Do you recall when?**

2  A I don't recall the specific date.

3  **Q Do you recall which directors conferred?**

4  A I don't specifically recall.

5  **Q Other than the individuals who are**

6 **ultimately appointed to the positions indicated,**

7 **were any other individuals considered for**

8 **appointment to those positions?**

9  A The company interviewed the senior

10 management team of the company, to my knowledge,

11 interviewed a number of candidates.

12  **Q Do you recall who was interviewed?**

13  A I don't.

14  **Q Do you recall the reason why these other**

15 **individuals were not selected for these positions?**

16  A If I might finish.

17  **Q I'm sorry.**

18  A To my knowledge, the company, as they do

19 in the ordinary course, interviewed a variety of

20 individuals to fill a post in the finance

21 department.  Glenn Hines was ultimately selected and

22 recommended by the company, and once the company

23 made the determination to hire him, there were no

24 other candidates considered for this particular

25 officer seat.

1  incurred in the course of providing those services.

2  And that is what is reflected here.

3      Q    Do you recall specifically what services

4  H.I.G. was performing when it incurred expenses; for

5  example, on your behalf, page 38 of the first

6  document that I handed to you, it's marked HIG

7  00223.

8      A    I can't recall the specific expense, but

9  as discussed before, services were provided in

10  association with various M&A divesture and financing

11  assignments.

12      And that is what much of this is.

13      Q    To your knowledge, were those bills paid

14  by DESA?

15      A    To my knowledge, the reimbursement of the

16  out-of-pocket expenses were paid.

17                  (Thereupon, a document was

18                  marked as Plaintiff's Exhibit No.

19                  27 for Identification.)

20  BY MR. TUFTS:

21      Q    Mr. Stokes, do you recognize this

22  document?

23      A    Yes.

24      Q    What is it?

25      A    It is an exchange of emails with GE

1      A     The company -- excuse me.  The lenders

2   seized the company's cash without any warning or

3   conversation with anyone at the company or anyone at

4   the board of directors.

5           The company was alerted to the situation

6   because checks weren't clearing with many of the

7   vendors.  They then alerted the board of directors,

8   namely, me, and Charles Hanaman of the situation.

9           We had a series of conversations.  I had a

10  series of conversations with the lenders who

11  initially seemed very inflexible in terms of finding

12  a resolution.

13          This was a tenuous and stressful and

14  surprising day for us all.  And what I was trying to

15  articulate was to -- if the banks were not going to

16  give the company use to its cash, if that were the

17  circumstance -- if those were the circumstances, at

18  some point, to protect the interest of all parties,

19  then filing may be what we need to do.

20      Q     **Filing for bankruptcy?**

21      A     Yes.

22      Q     **Is this the first time bankruptcy as an**

23  **option was discussed among the board of directors?**

24      A     Nothing was formally discussed among the

25  board of directors at this point.  This is me

1  board of directors authorized the engagement of AEG?

2       A    That's correct.  That was reflected in the

3  minutes we discussed, yes.

4       Q    Do you recall if Mr. Bluestein was present

5  at that meeting?

6       A    I don't specifically recall.

7       Q    Did the board --

8       A    You can look at records and see if he was

9  at that meeting.

10      Q    I'm sorry.

11      A    You can look at the records and see if he

12  was at that meeting.  I can't recall off the top of

13  my head.

14      Q    Did you read the text of the engagement

15  agreement prior to voting to ratify it?

16      A    I did review it previously, yes.

17      Q    Do you recall what authority was granted

18  to AEG under that agreement?

19      A    All of the customary powers of a chief or

20  structuring officer authorizing him to make all of

21  the day-to-day decisions, and additionally decisions

22  regarding the divestiture of assets and value

23  creating opportunities such as this.

24      Q    Was the authority to conduct layoffs of

25  DESA employees included in that engagement

1    agreement?

2        A    I can't recall if it was in that specific

3    agreement, but that was part of his authority, yes.

4        **Q    If that authority was not specifically**

5    **provided for the engagement agreement, what would**

6    **have been the other source of authority for Mr. Dean**

7    **to conduct layoffs?**

8            MR. DAVIS:  Objection.  Calls for

9        speculation.

10   BY MR. TUFTS:

11       **Q    To the extent you know, go ahead and**

12   **answer, please.**

13           MR. DAVIS:  Don't speculate.  If you know

14       the answer.

15           THE WITNESS:  Say the question again.

16   BY MR. TUFTS:

17       **Q    Was there a source of authority other than**

18   **the engagement agreement to conduct layoffs?**

19       A    I'm not aware.

20       **Q    Okay.  Do you recall discussing the WARN**

21   **act with Mr. Dean?**

22       A    I recall it being part of our discussions,

23   but it was more in the content of him relying what

24   he had done as opposed to me providing input or him

25   frankly seeking my input.

1     **Q**    **Before December 5th, 2008?**

2     A    That Mr. Dean created, no.

3     **Q**    **That anyone created.**

4     A    Well, as you can see from the record, we

5 were in discussions with the banks, and the company

6 had provided, in conjunction with CDG, Conway Del

7 Genio, on various budgets that they asked us to

8 provide based on different liquidation scenarios and

9 whatnot.

10          I was not directly involved with any of

11 that.

12     **Q**    **So who created these budget.**

13     A    The company and Conway, Del Genio.

14     **Q**    **Okay.  Did Mr. Dean discuss who had**

15 **drafted the WARN notices that he had distributed?**

16     A    To my recollection, no, not to me.

17     **Q**    **Okay.  Did he indicate who actually**

18 **distributed the notices?**

19     A    To my recollection, no, not to me.

20     **Q**    **And Mr. Dean didn't ask for the authority**

21 **to terminate or layoff employees at DESA prior to**

22 **doing it?**

23     A    No.

24     **Q**    **Did DESA have a human resources officer?**

25     A    Yes.

1      Q    **What was his name?**

2      A    Charlie Schaut.

3      Q    **How do you know Mr. Schaut?**

4      A    I don't really know him particularly well.

5      Q    **How do you know that he's the HR officer**

6  **at DESA?**

7      A    Because I was on the board of directors of

8  DESA, and in that capacity that was known to me.

9      Q    **Did DESA maintain an employee handbook?**

10      A    I don't know.

11      Q    **Do you know who was responsible for**

12  **setting the compensation for DESA's employees?**

13      A    The management team of DESA.

14      Q    **Okay.  Did that include any officers who**

15  **were also H.I.G. employees or partners?**

16      A    No.

17      Q    **Okay.**

18      A    Other than for the hiring of a chief

19  executive-type officer or whatever, we would -- the

20  board would have a say in that compensation.

21      MR. BROWN:  Excuse me.  It's Ken Brown.

22      Was there going to be a break at 2:00?

23  Because I have to take a call now as well.

24      MR. DAVIS:  Are we close to finishing?

25      MR. BROWN:  I didn't anticipate that this

1      would be going on so long.

2                          (Thereupon, a discussion was

3                  held off the record.)

4           MR. BROWN:  I am going to drop off and

5      patch back in when I can.

6                          (Thereupon, Mr. Brown exited

7                  the deposition proceedings.)

8  BY MR. TUFTS:

9      **Q    Who is responsible for hiring and firing**

10  **or laying off nonexecutive employees at DESA?**

11     A    The DESA management team.

12     **Q    Okay.**

13                          **(Thereupon, a document was**

14                  **marked as Plaintiff's Exhibit No.**

15                  **44 for Identification.)**

16  **BY MR. TUFTS:**

17     **Q    Mr. Stokes, do you recognize this**

18  **document?**

19     A    Yes.

20     **Q    What is it?**

21     A    This is an email from Mike Briggs to me.

22     **Q    And what was being discussed in this**

23  **email?**

24     A    Bonus pools being allocated to members of

25  the international team somehow in conjunction with

1    administration work for DESA employees?

2          A    I have no idea.

3          Q    Do you recall who performed the benefits

4    administration work for H.I.G. employees?

5          A    I have no idea.

6          Q    Have H.I.G. or any of its funds held a

7    joint account with any DESA entity?

8          A    Held a joint account with any DESA entity,

9    what do you mean by that?

10          Q    Joint bank account --

11          A    No.

12          Q    -- with DESA on it in the name of H.I.G.?

13          A    To my knowledge, no.

14          Q    Did H.I.G. and DESA ever share or occupy

15    any common facilities?

16          A    No.

17          Q    Did H.I.G. and DESA ever share any

18    equipment, materials, office supplies or anything

19    like that?

20          A    No.

21          MR. TUFTS:  Jody, do you want to ask any

22       questions?

23          MR. DAVIS:  No, I don't need to ask any

24       questions.

25          MR. TUFTS:  I don't have any further

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>DHP HOLDINGS II CORPORATION, et al.,<br><br>Debtor.<br>-------------------------------------------------------------<br>JOHN MANNING and TONY QUESENBERRY<br>on their own behalf and on behalf of all other<br>persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DHP HOLDINGS II CORPORATION a/k/a,<br>DESA (CAYMAN) HOLDING, LLC, DESA<br>(CAYMAN) II HOLDING, LLC, DESA, LLC,<br>DESA HEATING, LLC, DESA SPECIALTY,<br>LLC, DESA FMI, LLC, DESA IP, LLC, DESA,<br>LLC, and HIG CAPITAL, LLC,<br><br>Defendants. | Chapter 11<br><br>Case No. 08-13422 (MFW)<br>(Jointly Administered)<br><br><br><br><br><br>Adv. Pro. No. 09-5023 (MFW) |

**ERRATA SHEET FOR THE
DEPOSITION OF RICHARD S. STOKES**

| PAGE | LINE | CHANGE FROM | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|---|
| 22 | 1 | "heat unit" | "Heath Zenith" | Transcription error |
| 22 | 4 | "CO letters" | "Senior Lenders" | Transcription error |
| 22 | 8 | "I would not say that these" | "I would not say that. These" | Transcription error |
| 23 | 20 | "facilities in the operations" | "facilities and the operations" | Transcription error |
| 37 | 18-19 | "largely by bulk email." | "largely by email." | Transcription error |
| 40 | 4 | "McMullin" | "McMullen" | Misspelling. |
| 95 | 25 | "merchant acquisitions" | "mergers and acquisitions" | Transcription error |
| 104 | 11-12 | "that you have told BM2" | "that you have not told BM2" | Transcription error |
| 111 | 14 | "Charles Anthony" | "Charles Hanemann" | Transcription error |

| 112 | 10 | "relaid" | "relayed" | Misspelling |
|-----|----|----------|-----------|-------------|
| 119 | 11 | "Buldoc" | "Bolduc" | Misspelling |
| 123 | 23 | "content" | "context" | Transcription error |
| 125 | 5 | "I don't specifically, no." | "I don't specifically know." | Misspelling |
| 139 | 13 | "McHaskell" | "McCaskill" | Misspelling |

Richard S. Stokes

Date: ___5/3/2010___

Sworn and subscribed to before me this _03_ day of May, 2010.

Notary Public
My commission expires: _06|10|2012_

PAOLA GIANINO
Comm# DD0796512
Expires 6/10/2012
Florida Notary Assn., Inc