# EXHIBIT D TO BURNS DECLARATION

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DHP HOLDINGS II CORPORATION, et al.,[1] | ) | Case No. 08-13422 (___) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

### DECLARATION OF CRAIG S. DEAN, CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF FIRST DAY MOTIONS

I, CRAIG S. DEAN, hereby declare and state as follows:

1.    I am the Chief Restructuring Officer of DHP Holdings II Corporation ("DHP Holdings"), *et al.*, the debtors and debtors in possession in this proceeding (collectively, "DESA" or the "Debtors"). I have been employed in this capacity since December 12, 2008. I am a Principal of AEG Partners, LLC ("AEG"), which was retained as the Debtors' restructuring advisor on or about December 12, 2008. I am familiar with the day-to-day operations, business affairs and books and records of the Debtors.

2.    In order to enable the Debtors to minimize the adverse effects of the commencement of their chapter 11 cases on their businesses, the Debtors have requested various types of relief in "first-day" applications and motions (collectively, the "First Day Motions"). The First Day Motions seek relief that is: (a) necessary to enable the Debtors to operate in

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are DHP Holdings II Corporation (5945);DESA LLC (5717); DESA Heating LLC (8137); DESA Specialty LLC (8143); DESA FMI LLC (8146); and DESA IP LLC (8149). The address for each of the Debtors is 2701 Industrial Drive, Bowling Green, KY 42101.

chapter 11 with minimal disruption to their current business operations; and (b) essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

3.　　　I submit this declaration in support of the First Day Motions. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion. Except as otherwise indicated, all statements in this declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, or my opinion based on my experience with the Debtors' operations and financial condition. In making my statements based on my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing or collecting any such documentation and other information.

4.　　　If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this declaration on behalf of the Debtors.

5.　　　Part I of this declaration describes the Debtors' business and the circumstances surrounding the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of the other First Day Motions filed by the Debtors concurrently herewith.

2

## PART I

## Background

6.    On December 29, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and a motion to procedurally consolidate their chapter 11 cases (the "Chapter 11 Cases") for administrative purposes only. The Debtors are continuing to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and no official committee of creditors has been established in these cases.

## Introduction

7.    DHP Holdings is incorporated under the laws of the State of Delaware. Each of the remaining five Debtors is incorporated under the laws of the State of Florida. A chart setting forth the Debtors' corporate structure is attached as Exhibit "A" to this declaration.

8.    DESA is headquartered in Bowling Green, Kentucky and has both a domestic and international presence. To operate their domestic businesses, the Debtors operate two manufacturing and distribution facilities (located in Alabama and California), two manufacturing facilities (located in Kentucky and Tennessee), one distribution facility (located in Kentucky), and one storage facility (located in Alabama). DESA's international operations consist of the manufacturing, marketing and distribution of heating and related commercial products in Europe and Mexico, with manufacturing facilities in Italy and Poland and sales and

3

distribution facilities in Canada, Mexico, and China, all through their nondebtor foreign subsidiaries as described below.

9. Prior to the filing of bankruptcy, the Debtors and their nondebtor subsidiaries and affiliates were a leading manufacturer, distributor, and marketer of vent-free heating appliances, outdoor heaters, lawn and garden electrical products, and consumer fastening systems in the United States. Through their ability to consistently offer consumers quality products with innovative features at competitive prices, DESA developed leading market positions in: (i) vent-free indoor heaters; (ii) vent-free hearth products; (iii) outdoor heaters; (iv) lawn and garden electrical products; and (vii) consumer fastening systems.

10. The Debtors are parties to a Prepetition Senior Credit Agreement with the Prepetition Senior Lenders (both as defined below). The Debtors have defaulted under the Prepetition Senior Credit Agreement several times since February 2005. Pursuant to various amendments and forbearance agreements entered into from time to time, the Prepetition Senior Lenders provided additional funding, extended the termination of the Prepetition Senior Credit Agreement and waived certain continuing defaults in exchange for more restrictive terms and increased interest and fees. Pursuant to the most recent amendment, the Prepetition Senior Indebtedness (as defined below) became due and payable in full in cash and all commitments to lend under the Prepetition Senior Credit Agreement terminated on November 29, 2008.

11. Over the last year, the Debtors had begun the implementation of a significant restructuring plan to substantially improve their operating and income performance. Included in the plan were: the closure of multiple facilities; substantial reduction in salaried

4

workforce; product redesign initiatives to yield substantial cost reduction; and quality initiatives to reduce cost of product warranties. As of November 24, 2008, one facility closure was substantially completed, and the salaried workforce was substantially reduced. Notwithstanding these cost-saving actions, as of December 2008, the Debtors required additional financing to support the pre-heating season working capital build for the next fiscal year and complete the remaining restructuring initiatives.

12.     On December 5, 2008, the Debtors proposed to their Prepetition Senior Lenders a funding strategy that would provide the financing necessary to continue the Debtors' operations. On the same date, the Prepetition Senior Lenders rejected the proposal and informed the Debtors that they were unwilling to lend additional funds to the Debtors. In addition, the Prepetition Senior Lenders swept and/or froze all cash in the Debtors' bank accounts -- including their payroll and health benefits accounts -- and informed the Debtors that they would agree to the limited use of cash collateral solely on a case by case basis. As a result of such actions, certain checks, which the Debtors believed would be honored at the time they were issued, were returned for insufficient funds.

13.     The absence of further funding, coupled with the overall rapid decline in the economy, quickly and severely impacted the Debtors' operations. The Debtors were forced to engage in drastic restructuring measures in an attempt to meet their operational needs. In connection therewith, and in compliance with a request made by the Prepetition Senior Lenders, on December 12, 2008, the Debtors retained AEG as their restructuring advisor and I was appointed as the Chief Restructuring Officer.

5

14.     As hereinafter described, the Debtors have taken substantial additional steps to save costs and preserve their remaining assets, including, among other things, substantially reducing their workforce and limiting their operations. Since December 5, 2008, the Debtors have been operating solely with the limited use of cash collateral on a severely restricted basis as mandated by their lenders.

**Chapter 11 Cases of Former DESA Entities and Purchase By HIG-DESA Acquisition LLC**

15.     DESA Holdings Corporation and DESA International LLC (the "Former DESA Entities") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court on June 8, 2002. Those cases are jointly administered under Case No. 02-11672 (KG). On December 13, 2002, the Bankruptcy Court entered an order approving and authorizing the sale (the "Sale") of substantially all of the Former DESA Entities' assets to HIG – DESA Acquisition LLC ("Acquisition"), now known as DESA LLC, a debtor and debtor in possession in this case, for the purchase price of approximately $198 million – consisting of $185 million in cash plus unsecured subordinated notes in the original aggregate principal amount of $13 million, bearing interest, payable in kind, at the annual rate of 10%, due and payable on December 24, 2007 (the "Subordinated Notes"). The Sale closed on December 24, 2002.

16.     On December 6, 2004, pursuant to that certain settlement and release agreement by and among the Former DESA Entities and Acquisition and the terms and conditions of the Subordinated Notes, Acquisition redeemed the Subordinated Notes from the Former Debtor Entities for $9,722,226, thereby entitling Acquisition to receive a discount equal to the sum of (i) 25% of the note final payment and (ii) $1,075,000.

6

17. The chapter 11 cases of the Former DESA Entities remain open. Upon information and belief, the only activity occurring in those cases consists of limited claims resolution activities and the required filing of necessary postconfirmation reports and payment of postconfirmation fees. No claims or other issues remain open between the Debtors and Former DESA Entities.

## Business Segments and Products

18. DESA is organized into three divisions: (a) zone heating, which includes all indoor and outdoor heaters and hearth products sold in the United States ("Zone Heating"); (b) specialty products, which includes specialty tools sold in the United States, as well as all products sold in Canada ("Specialty Products"); and (c) international, which includes all products sold outside North America. The Zone Heating division comprises: (i) indoor vent-free; (ii) vent-free hearth; (iii) vented hearth; and (iv) outdoor heating products. The Specialty Products division includes: (i) electrical lawn and garden products; (ii) consumer fastening systems; and (iii) portable electricity generators.

19. DESA sells its products through multiple consumer and commercial channels, including construction and industrial equipment dealers, leading home centers, mass merchants, hardware cooperatives, LP gas distributors, and farm supply outlets. The Debtors sell their products through recognizable brands known by the Debtors' distribution channels and customers alike as having a strong reputation for superior quality and safety. In 2008, the Debtors' heating and tool products received multiple awards and distinctions from various homes

7

centers, including Home Depot and Wal-Mart, as well as magazines such as Time Magazine and Popular Mechanics.

20.    As of November 29, 2008, total annual revenues for the Debtors, together with their nondebtor subsidiaries and affiliates, were approximately $172,957,000. Of this amount, the U.S. operations generated approximately $131,644,000[2] in revenues and foreign operations accounted for approximately $41,313,000 in revenues. As of November 29, 2008, total annual net losses on a consolidated basis were approximately $22,642,000. Of this amount, the U.S. operations generated approximately $24,269,000 in operating losses, while foreign operations generated approximately $1,627,000 in net income.

21.    As of November 29, 2008, the Debtors, together with their nondebtor subsidiaries and affiliates, had consolidated assets with a net book value of approximately $132.5 million and consolidated liabilities with a net book value of approximately $133.2 million.

## Industry Overview

## Zone Heating

22.    The zone heating market includes a broad range of products that are used to heat limited areas, such as a room or a cluster of rooms, as distinguished from central heating systems that are used to heat entire buildings. Zone heating products include hearth products, indoor vent-free gas heaters, outdoor heaters, and accessories for these products. The retail heating market is currently estimated to be approximately $935 million in size, consisting of: (i)

---

[2] Of this amount, Zone Heating products generated approximately $88 million in revenues and Specialty Products generated approximately $45 million in revenues.

indoor heating products, accounting for approximately $842 million or approximately 90% of the total market; and (ii) outdoor heating products, amounting to approximately $93.3 million of the total market. The commercial heating market, consisting mainly of hearth products, is estimated to be approximately $1.6 billion. The increasing popularity of zone heating products can be attributed to: (i) a preference for gas-based products; (ii) the lower cost and greater energy efficiency of zone heating versus central heating; and (iii) the increasing popularity of fireplaces as both heating sources, as well as decorative home furnishings.

23.     Sales of DESA's Zone Heating products follow seasonal patterns that affect the results of operations. Demand for Zone Heating products has been historically highest in the fiscal third quarter as consumers prepare for winter. For this reason, DESA's net sales and fiscal operating profit have also been historically highest during DESA's fiscal third quarter. Warm fall or winter weather generally reduces demand for Zone Heating products.

### Specialty Products

24.     DESA participates in certain niche segments of the broader specialty products industry, such as (i) electrical lawn and garden products, including chain saws, pole saws and garden tillers; (ii) consumer fastening systems, including stapling/rivet tools, as well as tools and accessories used to fasten wood, concrete and steel, and (iii) portable electricity generators. Sales of these specialty products made the Debtors a driving force in the professional as well as the expanding "do it yourself" markets. The estimated total market for these specialty products is approximately $1.6 billion, with the retail segment approximately $1.2 billion in size.

9

## Description of the Debtors' Indebtedness

25.     As of the Petition Date, the Debtors owed approximately $126.8 million to creditors including, but not limited to, (i) approximately $40.8 million in senior debt under the Prepetition Senior Credit Facility , (ii) approximately $15 million in subordinated debt under the Prepetition Subordinated Credit Agreement, (iii) approximately $32 million in trade debt, and (iv) approximately $39 million in other debt not including the amounts described in (i) through (iii).

## Prepetition Senior Indebtedness

26.     Before the Petition Date, the Debtors partially funded their operations through a credit facility (the "Prepetition Senior Credit Facility") established under that certain credit agreement dated December 6, 2004 (as amended, the "Prepetition Senior Credit Agreement") by and among the Debtors (other than DHP Holdings), as borrowers, GE Business Financial Services (formerly known as Merrill Lynch Business Financial Services Inc.), as administrative agent (the "Prepetition Senior Agent"), and certain other lenders specified therein (collectively, the "Prepetition Senior Lenders").  The Prepetition Senior Credit Facility is composed of (i) a term loan in the original amount of $150,000,000; (ii) a revolving credit line in the original amount of approximately $22.6 million; (iii) unissued swing loans; and (iv) issued letters of credit in the amount of $3.8 million.  DHP Holdings and DHP Acquisition (as defined below) each unconditionally guaranteed all of the borrowings and other obligations of the Debtors under the Prepetition Senior Credit Facility pursuant to a Guaranty dated as of April 28, 2006.

27.     The indebtedness under the Prepetition Senior Credit Facility and all related obligations (the "Prepetition Senior Indebtedness") are secured by first priority liens (the "Prepetition Senior Liens") on substantially all of the Debtors' assets, inventories and receivables, including, without limitation, 65% of the equity interests held by DESA LLC in nondebtor subsidiary HIG-DHP Barbados, Ltd. ("HIG-DHP Barbados").

28.     For the last several years, the Debtors have been in default under several provisions of their Prepetition Senior Credit Agreement with the Prepetition Senior Lenders. The Debtors first defaulted on EBITDA and other covenants in February 2005 and February 2006. Amendments to the Prepetition Senior Credit Agreement to address these defaults resulted primarily in amendment fees and increased interest rates. In November of 2006, the company defaulted on EBITDA for a third consecutive year. The resulting fifth amendment to the credit agreement executed on June 11, 2007, carried numerous, and much more restrictive, covenants regarding EBITDA performance, capital expenditures, maximum allowable cash, and performance restrictions on weekly cash collections and disbursements. This amendment also froze the Debtors' credit line, permitted the Debtors to obtain additional financing from H.I.G. Capital Partners III, LP ("HIG Capital") pursuant to the Prepetition Subordinated Credit Agreement (as defined below), and required the sale, within a prescribed time frame, of the company's most profitable operating division, Heath Zenith, with the proceeds to be used to pay down the credit line.

29.     The sale of Heath Zenith was completed in August of 2007, and $127 million of net proceeds were used by the Debtors to pay down the Prepetition Senior

Indebtedness, retiring approximately two thirds of the then existing debt, and reducing the credit balance outstanding under the Prepetition Senior Credit Facility from approximately $185 million to approximately $60 million. Following this retirement of a substantial portion of the debt, the Debtors defaulted on the terms of the fifth amendment to the Prepetition Senior Credit Agreement in November and December of 2007, as well as in January of 2008, due to the insufficiency of the borrowing base to support the outstanding loan balance, and again in February of 2008 on account of an insufficient borrowing base and EBITDA. In March of 2008, the Prepetition Senior Lenders froze and swept the Debtors' cash accounts, and applied an additional $4 million to reduce the outstanding debt to $56 million.

30.     Thereafter, the parties entered into the sixth amendment and forbearance agreement on March 14, 2008, pursuant to which the Debtors' bank accounts were reopened, but the credit line remained frozen. In addition, it established EBITDA and minimum cash on hand requirements and required the sale of the Debtors' international operations by October 14, 2008. Following this, in June of 2008, the Debtors negotiated the release of a $10 million escrow deposit associated with the sale of the Heath Zenith operations. The Debtors and Prepetition Senior Lenders then entered into the seventh amendment to the Prepetition Senior Credit Agreement on June 24, 2008, pursuant to which, among other things, (i) the Prepetition Senior Lenders acknowledged the receipt of escrow in lieu of pledging remaining ownership interests in HIG DHP Barbados, and (ii) the Debtors paid approximately $10 million to the Prepetition Senior Lenders resulting in a further reduction of the outstanding debt to approximately $46 million. On August 27, 2008, the parties entered into the eighth and final amendment to the

12

Prepetition Senior Credit Agreement, which extended the deadline for the company to sell its international operations to November 29, 2008. The sale was not completed by November 29, 2008.

31.     As set forth above, on December 5, 2008, the Prepetition Senior Lenders informed the Debtors that they would not provide additional funding to the Debtors and swept and/or froze all remaining cash in the Debtors' bank accounts. Since then, the Debtors have been operating solely with the limited use of cash collateral on a severely restricted basis as mandated by their lenders.

32.     As of the Petition Date, the outstanding principal amount due under the Prepetition Senior Credit Facility was approximately $40.8 million, exclusive of accrued but unpaid interest, costs, fees and expenses, consisting of (i) approximately $27.7 million outstanding on the term loan debt and (ii) approximately $13.1 million outstanding on the revolving credit line. There are no outstanding letters of credit as of the Petition Date.

### Prepetition Subordinated Indebtedness

33.     The Debtors (other than DHP Holdings), HIG Capital Partners, as agent (the "Prepetition Subordinated Agent"), and certain other lenders (collectively, the "Prepetition Subordinated Lenders") are parties to that certain credit agreement dated as of June 11, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Subordinated Credit Agreement"). Funds borrowed pursuant to the Prepetition Subordinated Credit Agreement were used for the Debtors' domestic working capital purposes.

34.     The indebtedness under the Prepetition Subordinated Credit Agreement and all related obligations (the "Prepetition Subordinated Indebtedness") are secured by second priority liens (the "Prepetition Subordinated Liens") upon certain portions of the Debtors' prepetition collateral, subject to the Prepetition Subordination Agreement (as defined below).

35.     Pursuant to that certain Subordination and Intercreditor Agreement dated as of June 11, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Subordination Agreement"), the Prepetition Senior Indebtedness is senior and superior in right of time and payment to the Prepetition Subordinated Indebtedness, and the Prepetition Senior Liens are senior and superior to the Prepetition Subordinated Liens.

36.     Pursuant to a cross-default provision in the Prepetition Subordinated Credit Agreement, the Debtors have defaulted thereunder as a result of the Debtors' defaults under the Prepetition Senior Credit Agreement.

37.     Pursuant to various amendments and forbearance agreements, the term of the Prepetition Subordinated Credit Agreement has been extended to July 31, 2009.

38.     As of the Petition Date, the outstanding principal amount due under the Prepetition Subordinated Credit Agreement was approximately $15 million, exclusive of accrued but unpaid interest, costs, fees and expenses.

### Description of the Debtors' Equity Structure

39.     DHP Holdings is wholly owned by DHP Acquisition Corporation ("DHP Acquisition"), a corporation organized under the laws of the Cayman Islands. DHP Holdings is the parent company of Debtor DESA LLC, which in turn holds 100% of the equity of Debtors

14

DESA Heating LLC, DESA Specialty LLC, DESA FMI LLC, DESA IP LLC, as well as nondebtor HIG-DHP Barbados. HIG-DHP Barbados holds 100% of the equity of all foreign nondebtor subsidiaries,[3] which manufacture, distribute and sell commercial and consumer goods in Europe, Mexico, and Canada.

### Factors Leading to the Commencement of the Debtors' Chapter 11 Cases

40.     Over the last several years, and more specifically in the last year, the Debtors have completed significant restructuring changes that have resulted in a reduced debt load, revised ownership structure and realignment of sales, marketing and manufacturing operations. The Debtors continued to pursue various related initiatives, including without limitation: the implementation of price increases to offset supplier price increases, consolidation of manufacturing and distribution (including the planned closing of all domestic facilities with the exception of the Bowling Green headquarters facility), improvement of productivity, reduction in purchasing, further reduction of workforce and revision of sourcing needs and the demand planning process. The foregoing initiatives were designed to further cut costs and improve profitability.

41.     Notwithstanding the Debtors' pursuit of these initiatives, the depressed economy and negative trends in the Debtors' business have led to a severe liquidity crisis. The liquidity crisis recently was compounded when the Prepetition Senior Lenders informed the

---

[3] The nondebtor foreign subsidiaries are: DESICO SA de CV (Mexico); DESA UK Ltd. (UK); DESA Europe BV (Netherlands); DESA Industries of Canada, Inc. (Canada); DESA Heating Equipment Shanghai, Co. Ltd. (China); DESA Germany-Branch of UK (Germany); Desa Italy srl (Italy); and DESA Poland zoo (Poland). None of DESA's direct or indirect foreign subsidiaries are debtors in the Chapter 11 Cases or in any related bankruptcy, reorganization, or liquidation proceeding.

15

Debtors on or about December 5, 2008 that they would no longer lend any additional funds to the Debtors and swept and/or froze all cash in their accounts, thereby forcing the Debtors to begin to operate solely on remaining cash collateral as allowed on a case by case basis by the Prepetition Senior Lenders.

42.     The absence of further funding, coupled with the overall rapid decline in the economy, quickly paralyzed the Debtors' operations. In light of this sudden crisis, the Debtors were forced, among other things, to substantially restrict their business operations, lay off employees and terminate health benefits. Specifically, on December 16, 2008,[4] the Debtors sent notices of planned employee terminations pursuant to the Workers Adjustment and Retraining Notification Act (the "WARN Act") to salaried Employees who worked in the Debtors' facilities located in Bowling Green, Kentucky and to field sales Employees. On December 17, 2008, the Debtors sent notices of planned employee terminations pursuant to the WARN Act to hourly and salaried Employees who worked in the Debtors' facility located in Santa Ana, California and to hourly Employees who worked in the Debtors' facilities in Bowling Green, Kentucky, as well as to the Union Employees' collective bargaining union representatives. Shortly thereafter, all hourly Employees were advised verbally that they were temporarily laid off and should not return to work unless the Debtors informed them it was necessary.

---

[4] As of early December 2008, the Debtors had employed approximately 623 persons (the "Employees"), approximately 275 of which were members of the Sheet Metal Workers' International Association (the "Union Employees").

16

43. Subsequently, on December 21, 2008, the Debtors notified 331 Employees (52 salaried and 279 hourly), including Union Employees (collectively, the "Terminated Employees"), as well as the Union Employees' collective bargaining union representatives, of their termination of employment effective as of December 21, 2008. In conjunction therewith, (i) by virtue of the termination of all Union Employees, the Debtors terminated the active Collective Bargaining Agreements (as defined below) covering Union Employees effective as of December 21, 2008 and (ii) the Debtors also terminated the Medical Plans (as defined below), effective as of December 21, 2008. The Debtors were compelled to terminate the Medical Plans because the Debtors did not have the ability to fund the payment of claims incurred under such plans after December 21, 2008.

44. As a result of the foregoing terminations, on the Petition Date the Debtors employed not more than 292 (consisting of 174 salaried and 118 hourly) Employees (the "Remaining Employees") to perform the functions necessary to effectively and efficiently wind down the Debtors' remaining business operations necessitated by the Debtors' lack of continued funding.

### The Filing of the Chapter 11 Cases and the Debtors' Bankruptcy Goals

45. The Debtors did not have the cash necessary to continue the operation of their business in the ordinary course, and were unable to obtain additional financing outside of bankruptcy. After consideration of all reasonably available alternatives, and in light of the Debtors' severe liquidity crisis, the Debtors determined that it was necessary to preserve their remaining assets from dismemberment by individual creditors, so that their value may be

17

maximized for the benefit of all of their creditors and to allow for an orderly winddown of the business for the benefit of all interested parties through the commencement of these Chapter 11 Cases.

46.    The Debtors intend to pursue an orderly winddown of their businesses for the benefit of all interested parties.  The Debtors believe that by using the chapter 11 process, they will be able to maximize the value of their remaining assets for the benefit of all creditors.

## PART II

### First Day Motions and Applications

47.    I believe that a critical and necessary element in the Debtors' attempts to conduct an orderly winddown of their business under chapter 11 of the Bankruptcy Code is the approval of the Debtors' First Day Motions submitted concurrently herewith.  The factual background and support for each of these first day pleadings is provided below.

### Procedural Motions

**B.    Motion for Order Directing
Joint Administration of Chapter 11 Cases**

48.    The six (6) companies that comprise the Debtors are related entities.  I am informed by counsel that, as a result of such ownership structure, the Debtors are "affiliates" within the meaning of section 101(2) of the Bankruptcy Code and that joint administration of their estates is appropriate under Bankruptcy Rule 1015(b).

49.    I am also informed by counsel that the joint administration of the Debtors' Chapter 11 Cases will permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in

18

interest, which will result in savings to the estates. Accordingly, I believe that the relief

requested in the joint administration motion is in the best interests of the Debtors' estates, their

creditors and other parties in interest and accordingly should be granted.

### Professional Retention Applications And Related Motions

**C.** **Application of the Debtors, Pursuant to Section 327(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1, for Authorization to Employ and Retain Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date**

50. The Debtors seek to employ and retain the firm of Pachulski Stang Ziehl

& Jones LLP ("PSZJ") as their counsel with regard to the filing and prosecution of the

Chapter 11 Cases and all related matters effective as of the Petition Date.

51. I believe that representation of the Debtors by PSZJ is critical to the

success of the Debtors' Chapter 11 Cases. The Debtors seek to retain PSZJ because of its

extensive experience and knowledge in the field of debtors' and creditors' rights and business

reorganizations under chapter 11 of the Bankruptcy Code and because of the Firm's expertise,

experience and knowledge practicing before this Court. In preparing for these Chapter 11 Cases,

PSZJ has become familiar with the Debtors' businesses and affairs and many of the potential

legal issues that may arise in the context of the Chapter 11 Cases. Accordingly, I believe that

PSZJ is both well qualified and uniquely able to represent them in the Chapter 11 Cases in an

efficient and timely manner.

52. I submit that an order granting such relief is in the best interest of the

Debtors, their estates, and any other parties in interest.

19

**D.** **Debtors' Application for an Order Authorizing the Employment and Retention of AEG Partners, LLC to Perform Restructuring Services for the Debtors And of Craig S. Dean as Chief Restructuring Officer of the Debtors and Kevin Willis as Assistant Restructuring Officer of the Debtors Pursuant to Section 363 of the Bankruptcy Code *Nunc Pro Tunc* to the Petition Date**

53.     The Debtors seek to employ and retain AEG to perform restructuring services for the Debtors in the Chapter 11 Cases, and Craig S. Dean and Kevin Willis as the Debtors' Chief Restructuring Officer ("CRO") and Assistant Restructuring Officer ("ARO"), respectively, upon the terms and conditions contained in the Engagement Agreement dated December 23, 2008.

54.     AEG is a consulting firm that specializes in, among other things, corporate restructuring, crisis management, and mergers/acquisitions in chapter 11 cases.

55.     I have over 25 years progressive experience working with troubled companies, managing business turnarounds as well as other corporate leadership roles. My work at AEG has focused on large, complex business turnarounds and restructuring engagements for distressed companies in the roles of strategic advisor, chief restructuring officer and interim president. I have served as chief restructuring officer in many reorganizations including American Paper Group, Folio Exhibits, Hoboken Wood Flooring and Scientech, Inc.

56.     Mr. Willis is a Senior Director of AEG. His recent work with AEG includes advising a food manufacturer on cost reduction initiatives and pricing improvement strategies, Chapter 11 preparation and restructuring of a large building products distribution firm, liquidity assessment, comprehensive cash forecasting for a data management company, and developing a plan for an out-of-court restructuring for a national telecommunications operator. Mr. Willis has participated in and led numerous client engagements with small and medium

20

sized companies as well as the Fortune 500, and has worked with over 45 different companies across the following industries: food manufacturing, direct sales, insurance, banking and financial services, pharmaceutical, telecommunications, transportation and logistics, consumer electronics, direct sales, consulting and real estate.

57.     AEG will assist and advise the Debtors, with respect to the process in the Debtors' Chapter 11 Cases leading to a possible refinancing, restructuring or modification of any or all of the Debtors' existing debt, other obligations or equity.  In this regard, I have been appointed CRO and Kevin Willis has been appointed ARO of the Debtors by their Boards of Directors.  I will report to and be subject to the direction of the Debtors' Boards of Directors, as will Mr. Willis when he is acting in lieu of me.  AEG, Mr. Willis and I will provide restructuring services as requested by the Debtors and described in the Engagement Agreement.

58.     The Debtors believe that the retention and employment of AEG and Messrs. Dean and Willis is necessary in these Chapter 11 Cases, and that they are well qualified and able to represent the Debtors in a cost-effective, efficient, and timely manner.

E.     **Application of the Debtors for Order Under 28 U.S.C. §156(c)
Approving the Retention of and Appointing Epiq Bankruptcy
Solutions, LLC as Notice, Claims and Balloting Agent**

59.     The Debtors have selected Epiq Bankruptcy Solutions, LLC ("Epiq")as their notice, claims and balloting agent.

60.     The Debtors estimate there will be approximately 2,000 creditors holding claims against the Debtors' estates.  Furthermore, the Debtors believe that there are thousands of creditors, former employees, and other parties in interest who require notice of various matters,

21

and in particular, the deadline for filing proofs of claim. Additionally, many of these parties may file proofs of claim and cast ballots with respect to a liquidating or other plan.

61.     The size of the Debtors' creditor body makes it impractical for the Clerk to send notices and to maintain a claims register and tabulate ballots. Accordingly, Epiq will serve as the Court's notice agent to mail certain notices to the estates' creditors and parties in interest, (ii) provide computerized claims, claims objections and balloting database services, and (iii) provide expertise, consultation and assistance with claim and ballot processing and with other administrative information related to the Debtors' Chapter 11 Cases.

62.     By appointing Epiq as the Claims and Noticing Agent in these Chapter 11 Cases, creditors of the Debtors' estates will benefit from Epiq's significant experience in acting as a claims and noticing agent in other cases and the efficient and cost-effective methods that Epiq has developed in its seventeen years of operation. Therefore, I believe it is in the best interests of the Debtors' estates and their creditors to appoint Epiq as agent for the Clerk.

**F.      Debtors' Motion for an Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code**

63.     The Debtors request that procedures for compensating and reimbursing court-approved professionals on a monthly basis be established, comparable to those established in other similar sized chapter 11 cases in this District. As described above, the Debtors are seeking approval of their employment of PSZJ, as their bankruptcy counsel, and AEG as their restructuring advisors.

64.     The Debtors anticipate that they may also need to retain other professionals in these Chapter 11 Cases as the need arises. In addition, an official committee of

unsecured creditors may be appointed (the "Creditors' Committee"). The Creditors' Committee may also seek to retain various professionals (the "Committee Professionals"). The Debtors' various estate professionals (collectively, the "Estate Professionals") will carry out unique functions and will coordinate with one another to avoid unnecessary duplication of services while obtaining maximum advantage from each firm's expertise and knowledge of the Debtors.

65. Briefly stated, the requested procedures would permit each Estate Professional, subject to the procedures set forth in the motion, to file with the Court and present to the Debtors, the United States Trustee, counsel to the Committee, and certain other interested parties an application for interim approval and allowance of fees for services rendered and expenses incurred by each retained professional during the immediately preceding month.

66. I therefore submit that an order granting such relief is in the best interests of the Debtors, their estates, their creditors and any other parties in interest.

**G. Motion of the Debtors Pursuant to Sections 327, 328 and 330 of the Bankruptcy Code for an Order Authorizing the Debtors to Retain, Employ and Compensate <u>Certain Professionals Utilized by the Debtors in the Ordinary Course of Business</u>**

67. The Debtors retain the services of various professionals (estimated at approximately seven (7) firms) in the ordinary course of operating their businesses (the "Ordinary Course Professionals"). These Ordinary Course Professionals provide services to the Debtors in a variety of discrete matters including, but not limited to, employee benefits, general corporate, accounting, auditing, tax, intellectual property, and litigation matters.

68. The Debtors seek permission to continue to employ the Ordinary Course Professionals postpetition without the necessity of filing formal applications for employment and

compensation by each professional pursuant to sections 327, 328, 329 and 330 of the Bankruptcy Code. Due to the number and geographic diversity of the professionals that are regularly retained by the Debtors, it would be unwieldy and burdensome on both the Debtors and this Court to request each such Ordinary Course Professional to apply separately for approval of its employment and compensation.

69.  Based on the foregoing reasons, I submit that the ongoing retention of such Ordinary Course Professionals on the terms set forth in the motion is in the best interests of the Debtors, their estates and creditors.

### Motions Pertaining To Business Operations

**H.  Motion (A) For Authorization to: (I) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; and (II) Provide Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363 and (B) To Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001**

70.  The Debtors seek authority (i) to use cash collateral, (ii) to provide adequate protection to their lenders who assert an interest in cash collateral, and (iii) to schedule a final hearing on the foregoing relief. As described below, the Prepetition Senior Agent and the Prepetition Senior Lenders, and the Prepetition Subordinated Agent and the Prepetition Subordinated Lenders, have consented to the Debtors' use of their cash collateral pursuant to the interim order (the "Interim Order"), the final order (the "Final Order") and the Approved Budget (as defined below).

71.  As set forth above, the Debtors are parties to the Prepetition Senior Credit Agreement and Prepetition Subordinated Credit Agreement. The Debtors require the use of the cash collateral in which the Prepetition Senior Lenders and the Prepetition Subordinated Lenders

assert an interest (the "Cash Collateral"), in accordance with the approved budget attached to the motion (the "Approved Budget") and the terms of the Interim Order and Final Order, to fund the Debtors' operations, winddown and liquidation. The use of Cash Collateral will provide the Debtors with the necessary funds to operate and wind down their business, pay their employees and other expenses, including professional fees and expenses, conduct an orderly liquidation, and maximize the value of their estates for the benefit of their creditors. The use of Cash Collateral will terminate three (3) business days following receipt of notice by the Debtors from the Prepetition Senior Agent that their consent to the use of Cash Collateral has terminated (the "Termination Date"), after which any use of Cash Collateral by the Debtors shall only be pursuant to further order of the Court, with the objections and defenses of all parties in interest reserved.

72.     The Debtors seek to grant to the Prepetition Senior Agent, on behalf of the Prepetition Senior Lenders, and to the Prepetition Subordinated Agent, on behalf of the Prepetition Subordinated Lenders, the following adequate protection, solely to the extent of any diminution in value of the Prepetition Collateral:[5] (i) a replacement security interest in and lien upon all of the Postpetition Collateral, which Postpetition Collateral does not include Avoidance Actions or Avoidance Action Proceeds, and which replacement security interest and lien is subject to the Carve-Out and (ii) a superpriority claim, as provided for in section 507(b) of the Bankruptcy Code, subject to the Carve-Out, but which, subject to entry of the Final Order, shall be payable from, and have recourse to, the Avoidance Actions and Avoidance Action Proceeds

---

[5] Capitalized terms used in Part II, Section H of this declaration not otherwise defined herein shall have the meanings given to such terms in the Interim Order.

(collectively, the "Adequate Protection Obligations"). Without limitation, the Prepetition Senior Agent, for its benefit and the benefit of the Prepetition Senior Lenders, will be granted Adequate Protection Senior Liens by each Debtor on all Postpetition Collateral which does not also constitute Prepetition Collateral, including, without limitation, the unencumbered 35% of the equity interests owned by Debtor DESA LLC in non-Debtor HIG-DHP Barbados, on a dollar-for-dollar basis for each Accrued Employee Claim which is paid at any time on or after the Petition Date from the Cash Collateral. The replacement security interest and lien and the superpriority claim of the Prepetition Subordinated Agent for the benefit of the Prepetition Subordinated Lenders shall be subordinate to the replacement security interest and lien, and the superpriority claim of the Prepetition Senior Agent for the benefit of the Prepetition Senior Lenders.

73.     In addition, from and after the Petition Date, and regardless of whether such amounts are included in the Approved Budget, the Debtors shall continue to pay or reimburse, as and when due, the Prepetition Senior Agent for any and all of its accrued and past-due fees, costs, expenses and charges payable under the Prepetition Senior Credit Documents, including, without limitation, the reasonable attorneys' and other reasonable fees and expenses of the Prepetition Senior Agent as provided in Section 9.1 of the Prepetition Senior Credit Agreement, whether accrued prepetition or postpetition, all without further notice, motion or application to, order of, or hearing before, the Court; provided, however, that such payments shall be reapplied to reduce the principal amount of the Prepetition Senior Indebtedness to the

extent that the Prepetition Senior Agent is not entitled to such payment or reimbursement pursuant to section 506(b) of the Bankruptcy Code.

74.     Further, the liens and claims granted to any of the Prepetition Senior Agent, Prepetition Senior Lenders, Prepetition Subordinated Agent, or Prepetition Subordinated Lenders in the Interim Order, the Prepetition Senior Credit Documents and/or the Prepetition Subordinated Credit Documents shall be subject to the payment, without duplication, of (x) the unpaid fees payable to the United States Trustee and Clerk of the Bankruptcy Court pursuant to Section 1930 of Title 28 of the United States Code and (y) the claims of the respective retained professionals of the Debtors and the Creditors' Committee (collectively, the "Retained Professionals") for (i) paid and unpaid fees and expenses which were incurred at any time on and after the Petition Date and prior to the Termination Date and are provided for in the Approved Budget, and (ii) paid and unpaid fees and expenses of the which were incurred at any time after the Termination Date, up to $200,000; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by this Court under sections 330 and 331 of the Bankruptcy Code or otherwise.  Lastly, the Debtors have agreed to waive, subject to approval pursuant to the Final Order, any rights pursuant to section 506(c) of the Bankruptcy Code.

75.     I am informed by counsel that there are no provisions in the motion or Interim Order which must be identified pursuant to Local Bankruptcy Rule 4001-2(a)(i), except that (1) the Approved Budget and, accordingly, the Carve-Out provide for disparate treatment of

27

the Debtors' and the Creditors Committee's professionals and (2) the §506(c) waiver, which is subject to the entry of the Final Order.

76.     I believe that the Debtors have an urgent and immediate need for the use of Cash Collateral. Without the use of Cash Collateral, the Debtors will not be able to operate and wind down their business, and turn assets into cash in an orderly, effective and efficient manner to maximize the value of those assets for the benefit of their creditors. Accordingly, entry of the emergency Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates and, therefore, is appropriate under the circumstances. I believe that, absent authorization from the Court to use the Cash Collateral on an interim basis pending the final hearing on the motion, the Debtors will be immediately and irreparably harmed. The interim relief requested is critical to preserving and maximizing the value of the Debtors' assets for the benefit of their estates and creditors.. Therefore, I respectfully submit that the relief requested in the above-referenced motion should be granted by the Court.

**I.      Motion of the Debtors for Order Authorizing, But Not Directing, Payment of Certain Prepetition Shipping and Warehousing Obligations**

77.     To operate their businesses, the Debtors employ two manufacturing and distribution facilities, two manufacturing facilities, one distribution facility, and one storage facility. In order to move materials and product to and from their different facilities, the Debtors rely upon the services of certain common carriers, shippers, truckers and customs agents (the "Shippers") for ground transportation, air freight, ocean freight, and similar charges and freight forwarding charges (which freight forwarding charges may include in the amount payable to the freight forwarder for charges for customs duties and dock facilities) incurred by the Debtors,

28

including, I understand, those that give rise (or legitimately may give rise) to any statutory or common-law possessory liens on account of unpaid charges owing from the Debtors to such Shippers. As of the Petition Date, the Debtors estimate that they owe approximately: (i) $890,000 to on account of domestic shipping charges; (ii) $300,000 on account of ocean freight charges; (iii) $62,000 on account of United States customs fees; and (iv) $30,000 on account of per diem container charges (collectively referred to as the "Shipping Obligations").

78.     The Debtors also rely upon the services of certain third party warehousing and port facilities (the "Warehouse Operators") to store materials used by Debtors, and products produced by the Debtors in the operation of their businesses. As of the Petition Date, the Debtors estimate that they owe approximately $290,000 to the Warehouse Operators on account of such prepetition charges (the "Warehousing Obligations").

79.     Thus, the Debtors seek the entry of an order authorizing them to make non-disputed prepetition payments, up to a maximum amount of $250,000, to the Shippers and Warehouse Operators relating to the Shipping Obligations and Warehousing Obligations as the Debtors, in their business judgment, determine is necessary or appropriate in order to obtain the release of goods held by such Shippers and Warehouse Operators. The Debtors will only pay Shipping and Warehousing Obligations where they believe, in their reasonable business judgment, the benefit to their estates and creditors from making such payments will exceed (a) the costs that their estates would incur by bringing an action to compel the turnover of such goods and (b) the delays and resulting damage to the Debtors, their estates, and their customers associated with such actions (even if successful).

80.     I believe that such relief is necessary, because I understand that, under some state laws, a Shipper or a Warehouse Operator may have a lien on the goods in its possession, or may be entitled to other protections under applicable law. Moreover, the Debtors rely upon the services of the Shippers and Warehouse Operators. Transportation and storage charges are a small portion of the cost of sale of the Debtors' inventory, and if the Debtors are unable to pay such invoices, I believe the cost in lost inventory and sales could greatly exceed the amount of those invoices. Even if the Shippers and Warehouse Operators do not have valid liens, their possession and retention of or control over the Debtors' inventory could severely impact the Debtors' ability to maximize creditor returns in these Chapter 11 Cases. Thus, I respectfully submit that the relief requested in the above-referenced motion should be granted by the Court.

**J.     Debtors' Motions for the Entry of Orders, Pursuant to 11 U.S.C. § 365, Authorizing the Debtors to Reject (I) Unexpired Lease of Nonresidential Real Property and (II) <u>Certain Executory Contracts</u>**

81.     The Debtors are requesting, by two separate motions, the authority: (i) to reject an unexpired lease of nonresidential real property (the "Rejected Lease") and abandon certain personal property with inconsequential value in connection therewith; and (ii) to reject certain executory contracts (the "Rejected Contracts"). I believe that the relief requested is in the best interest of the Debtors' estates and creditors because the Debtors have determined, in the exercise of their sound business judgment, that they are no longer in need of: (i) the premises that are the subject of the Rejected Lease, which the Debtors no longer occupy, or any remaining personal property located therein; or (ii) the services, licenses and/or equipment provided by the

Rejected Contracts. Accordingly, I respectfully submit that the relief requested in both motions should be granted by the Court.

**K. Debtors' Motion for an Order (I) Authorizing the Debtors to Pay Prepetition Sales and Use Taxes and Regulatory Fees; and (II) Authorizing Banks and Financial Institutions to Process and Honor Checks and Transfers Related Thereto**

82. The Debtors seek authority to pay, in the Debtors' sole discretion, prepetition sales and use taxes (the "Sales and Use Taxes"), and regulatory fees (the "Regulatory Fees" – and together with the Sales and Use Taxes, the "Taxes and Fees") owed to the Taxing and Regulatory Authorities (defined below), including, without limitation, those Taxes and Fees subsequently determined upon audit to be owed for periods prior to the Petition Date, in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date) not to exceed $200,000, which is the maximum estimated amount that the Debtors currently believe may be due on account of prepetition Taxes and Fees.

83. In addition, to the extent any check issued or electronic transfer initiated prior to the Petition Date to satisfy any prepetition obligation for Taxes and Fees has not cleared the applicable banks or financial institutions as of the Petition Date, the Debtors request the Court to authorize the applicable banks and financial institutions, when requested by the Debtors in their sole discretion, to receive, process, honor, and pay such checks or electronic transfers, provided that there are sufficient funds available in the applicable accounts to make such payments. The Debtors also seek authorization to issue replacement checks, or to provide for other means of payment to the Taxing and Regulatory Authorities, to the extent necessary to pay

31

such Taxes and Fees outstanding and owing for periods prior to the Petition Date on account of such uncleared payments.

84.     For the following reasons, I believe that the failure to pay the Taxes and Fees could have a material adverse impact on the Debtors' ability to operate and other negative consequences, and that the payment of such Taxes and Fees is appropriate in these Chapter 11 Cases. First, I understand that certain amounts constitute "trust fund" taxes that are held for the benefit of the Taxing Authorities. Accordingly, because payment of the Sales and Use Taxes contemplated in such motion does not implicate property of the estates, such payments will not otherwise be available to the Debtors' estates or their creditors. Second, I understand that to the extent that any Sales and Use Taxes remain unpaid by the Debtors, the officers and directors of the Debtors may be subject to lawsuits or criminal prosecution during the pendency of these Chapter 11 Cases under applicable law. I believe that any such lawsuit or criminal prosecution (and the ensuing potential liability) would distract the Debtors and their officers and directors in their attempt to implement a successful bankruptcy strategy, to the detriment of all parties in interest in these Chapter 11 Cases and could result in indemnification claims.

85.     Third, the present circumstances warrant the relief requested in order to avoid audits, penalties, and licensing issues. I believe that allowing the payment of the Taxes and Fees is justified to avoid business interruption and preserve the value of the Debtors' assets. Lastly, I understand that certain Taxes and fees are entitled to priority status under applicable provisions of the Bankruptcy Code. Thus, in many cases, the payment of the Taxes and Fees that

are entitled to such priority in the ordinary course of the Debtors' business only affects the

timing of the payment and does not prejudice the rights of other creditors of the Debtors.

        86.    Based on the foregoing, I believe that allowing payment of the Taxes and

Fees is in the best interests of the Debtors' estates and creditors and accordingly should be

authorized.

**L.**      **Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 363, and 507(a) for an Order Authorizing the Debtors to (I) Pay and/or Honor Prepetition Wages, Commissions, Salaries, Employee Benefits, and Other Compensation or Reimbursements; (II) Remit Withholding Obligations; (III) Maintain Employee Compensation and Certain Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Honor, and Pay Certain Checks Presented for Payment and Honor Fund Transfer Requests**

        87.    As set forth above, at the start of December 2008, the Debtors employed

approximately 623 Employees, 275 of which were Union Employees. The Debtors employed no

part-time employees but from time to time hired temporary employees through third party

temporary agencies. Approximately 226 of the Employees were salaried and 397 Employees

were compensated on an hourly basis. In addition, 17 Employees who are sales personnel were

entitled to receive commissions. Two active collective bargaining agreements (the "Collective

Bargaining Agreements") governed the employment of the Union Employees.

        88.    As a result of the substantial reduction in workforce shortly before the

Petition Date, the Debtors now employ not more than 292 (consisting of 174 salaried and 118

hourly) Employees (collectively, the "Remaining Employees") to perform the functions

necessary to effectively and efficiently wind down the Debtors' remaining business operations.

89.     The Debtors seek to minimize the personal hardship to the Employees as a result of the filing of these Chapter 11 Cases, and to minimize the disruption to the Debtors' business, for the benefit of the Debtors' creditors and their estate, by requesting, in their discretion, the authority (a) to pay and/or honor, *inter alia*, certain prepetition claims for, among other items, wages, commissions and salaries (the "Wages"), employee benefits and other compensation or reimbursements (the "Benefits") for all Employees, including those Terminated Employees terminated shortly prior to the Petition Date, and to pay all costs incident to the foregoing (collectively, the "Wages and Benefits"), and (b) to continue to pay and/or honor such Wages and certain Benefits for the Remaining Employees as they become due postpetition in the ordinary course of the Debtors' business. The Wages and Benefits for which this relief is sought are set forth in detail below. The Debtors represent that they have (or will have) sufficient postpetition funding to pay promptly all Wages and Benefits, to the extent described and requested to be paid and/or honored in the motion, on an ongoing basis and in the ordinary course of business.

Wages and Benefits

Wages and Salaries and Associated Withholding

90.     The Debtors' historic average bi-weekly gross payroll was approximately $1,084,762.35, which figure included wages and salaries, and taxes (including withholding taxes paid by Employees), and withholdings for various Employee benefits, which are described more fully below, but excluded commissions. Salaried Employees were paid bi-weekly every other

Friday and hourly Employees were paid weekly, one week in arrears, every Friday.[6] The date on which all of the Debtors' Employees were last paid was December 19, 2008, for the period ended December 19, 2008, for salaried Employees, and for the period ended December 12, 2008, for hourly Employees. In addition, the Debtors (i) prepaid 40 of their salaried Employees on December 22, 2008, for the period through December 26, 2008, in the total amount of $86,217.82 and (ii) paid their hourly Employees on December 23, 2008, for the period through December 21, 2008, in the total amount of approximately $24,000.[7]

91.     As of the Petition Date, the Debtors owe approximately $53,000 for unpaid Wages consisting of commissions earned by Employees in the sales department for the months of November and December 2008. The Debtors therefore seek authority to pay the unpaid Wages up to a total and aggregate maximum amount of $55,000. I am informed and understand that no Employee is owed more than $10,950 in unpaid Wages.[8]

92.     In addition, the Debtors anticipate that some or all of the checks issued to salaried Employees on December 22, 2008 in the amount of $86,217.82 and to hourly Employees on December 23, 2008 in the approximate amount of $24,000 may not have cleared as of the Petition Date. Insofar as there are any checks issued in respect of any prepetition Wages, but not yet cashed, for pay periods before the Petition Date, the Debtors request authority

---

[6] Upon payment of accrued wages on the bi-weekly pay date, salaried Employees are brought current with respect to unpaid wages while hourly Employees are still owed one-week's salary. In other words, hourly Employees are always one week in arrears with respect to unpaid wages upon the occurrence of each bi-weekly pay date.

[7] No hourly Employees have worked from December 21, 2008 to the Petition Date, and hourly Employees worked minimal hours between December 12, 2008 and December 21, 2008.

[8] Four former employees (the "Terminated Employees") are owed payments under prepetition severance agreements (the "Severance Payments"). As of the Petition Date, the Debtors owe the Terminated Employees approximately $66,000. The Debtors do not seek to pay the Severance Payments pursuant to this Motion.

for such checks to be honored postpetition in the ordinary course of the Debtors' business or, if necessary, to reissue such checks.

93. The Debtors' payroll is processed and disbursed by Automated Data Processing ("ADP"). The average amount deducted by ADP for the processing of the Debtors' payroll and related administration (the "ADP Administration Fees") is approximately $3,500 per week but I understand will be greatly reduced on a postpetition basis on account of the lower number of Remaining Employees. Although the Debtors do not believe that they owe ADP any unpaid ADP Administration Fees as of the Petition Date, they request in an abundance of caution the authority to pay ADP Administration Fees up to the amount of $3,500. The Debtors also request authority to pay ADP the ADP Administration Fees that come due postpetition in the ordinary course of the Debtors' business.

94. In the ordinary course of their business, the Debtors routinely withhold from Wages certain amounts that the Debtors are required to transmit to third parties for purposes such as Social Security and Medicare, federal and state or local income taxes, contributions to the Debtors' benefit plans described more fully below, 401(k) contributions, garnishment, child support, union dues, or similar obligations pursuant to court order or law (collectively, the "Withholding Obligations"). In addition to the Withholding Obligations, the prepetition amount of which is approximately $67,108.11 (consisting of (i) $38,843.74 in withheld but unremitted union dues for the months of October through December 2008, (ii) $27,764.37 in withheld but unremitted premiums under the Medical Plans for the month of December 2008, and (iii) $500 in withheld but unremitted garnishments), the Debtors estimate

36

that, as of the Petition Date, approximately $14,000 of the Debtors' contributions (which number is included in the total unpaid Wages set forth above) to employee tax obligations were incurred and unpaid in connection with earned but as yet unpaid Wages (the "Employer Tax Obligations"). The Debtors request authority to pay the Employer Tax Obligations and to satisfy the other Withholding Obligations in connection with the payment of the Wages and to the extent described more fully below up to the total amount of $90,000.

Business Expense Reimbursements

95.     The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. Such expenses typically include, but are not limited to, business-related travel expenses, including air travel, auto travel and car rental, lodging, meal charges, business lunches, entertainment and trade show expenses, telephone charges, relocation expenses, and miscellaneous other allowed expenses (the "Reimbursement Obligations").

96.     It is not possible for the Debtors to determine the exact amounts of Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing. Based on historical experience, the Debtors anticipate that, as of the Petition Date, the Debtors owe an estimated $60,000 in Reimbursement Obligations for all Employees for expense reports that were submitted as well as those that had not yet been submitted as of the Petition Date. The Debtors seek authority to pay

37

any prepetition Reimbursement Obligations up to a total amount of $60,000, and to continue to honor Reimbursement Obligations incurred by Remaining Employees postpetition in the ordinary course of the Debtors' business. The Debtors also seek authority to honor checks issued for such Reimbursement Obligations prepetition, but which remain uncashed as of the Petition Date.[9]

### Health and Related Benefits

97.     Prepetition, the Debtors provided several health and related benefit plans to their Employees, including medical, dental, vision and prescription drug insurance, health care reimbursement accounts, life insurance, accidental death and dismemberment insurance, and short and long-term disability insurance. As noted above, the Debtors have terminated the Medical Plans effective as of December 21, 2008 and, accordingly, the relief requested with respect to the Medical Plans relates solely to the payment of prepetition accrued obligations thereunder.

### (1)     Medical Plans

98.     Prepetition, the Debtors self-insured medical, dental, vision, and prescription drug claims incurred by Employees up to the stop-loss limits set forth below pursuant to various health benefit plans (the "Medical Plans"). The Debtors have a stop loss insurance policy with HCC Life Insurance Company for claims incurred under the Medical Plans that exceed $150,000 per claimant. Meritain Health ("Meritain") is the third party administrator for the Medical Plans. Claims payments under the Medical Plans generally were funded by the

---

[9] The Debtors issued checks for Reimbursement Obligations in the total approximate amount of $90,000 on December 26, 2008. The Debtors anticipate that some or all such checks may not have cleared as of the Petition Date.

Debtors on a weekly basis in compliance with weekly requests made by Meritain. The Debtors transferred funds to their benefits account maintained at U.S. Bank and issued a check for the requested amounts to Meritain. Employees contributed to the plans, with such contributions varying based on income and coverage level.

99. As described above, the Debtors terminated their Medical Plans on December 21, 2008, because they no longer had the funds necessary to provide continuing benefits thereunder. Since the Medical Plans have been terminated, the Debtors do not seek authority to provide any future benefits under such plans. For all Medical Plans, the Debtors seek authority to continue to honor and pay all unreimbursed claims and administrative fees incurred before December 21, 2008.

100. The Debtors estimate that they may owe up to a combined approximate amount of $822,929.41 to Meritain on account of (i) processed but unpaid prepetition health benefit claims of Employees and their covered dependants in the approximate amount of $791,929.41 (the "Prepetition Processed Medical Claims") and (ii) prepetition administrative fees in connection with the maintenance and administration of the Medical Plans in the approximate amount of $31,000 (the "Prepetition Medical Administrative Fees"). In addition, the lag time for claims on services performed by physicians and health benefit service providers, but not yet submitted or paid, is approximately up to two months. Employees have up to one year to submit claims under the Medical Plans. Based on the average monthly amount of claims paid under the Medical Plans, the Debtors estimate that there is an additional amount of approximately $550,000 in outstanding prepetition medical, dental, vision, and prescription drug

39

services claims for Employees and their covered dependants under the Medical Plans that have not yet been submitted and/or processed, exclusive of administrative costs owed to Meritain (the "Prepetition Unprocessed Medical Claims"). The Debtors seek authority to pay the Prepetition Processed Medical Claims, the Prepetition Unprocessed Medical Claims, and the Prepetition Medical Administrative Fees in the ordinary course of their business up to the aggregate amount of $1,375,000.

(2)     FlexSave Program

101.    The Debtors offer their Employees access to flexible spending accounts ("FSAs") to set aside pre-tax dollars to pay for eligible medical and dependent care costs. The FSA program (the "FSA Program") is administered for the Debtors by FEBCO, Inc. ("FEBCO"). An eligible Employee's FSA deduction is taken out of his or her paycheck each pay period and put in an account to be used for eligible expenses throughout the year. The Debtors estimate that approximately $2,500 in accrued FSA contributions from three Employees remain unremitted as of the Petition Date (the "FSA Contributions"). The Debtors seek authority to honor the FSA Contributions in connection with satisfaction of the Wages, and to continue to provide the FSA Program postpetition in the ordinary course of the Debtors' business until the FSA Contributions have been consumed. FEBCO has agreed that it will continue to administer the FSA Program free of charge on a postpetition basis. Permitting the Debtors to continue the program will avoid adverse tax consequences for Employees and will cost the Debtors nothing. The Debtors do not believe they owe any unpaid prepetition Administration Fees to FEBCO as of the Petition Date. In an abundance of caution, however, the Debtors seek authority to pay FEBCO any remaining

40

prepetition administration fees (the "FEBCO Administration Fees") up to $200 in the ordinary course of business postpetition.

> (3)     Disability Plans and AD&D and Life Insurance

### The Disability Plans

102.    Prior to December 21, 2008, the Debtors provided all exempt Employees with income protection plans for short-term and long-term disability (collectively, the "Disability Plans"). The Debtors paid the entire cost of the Disability Plans.

103.    The Debtors do not owe any amounts on account of unpaid prepetition obligations in connection with the Disability Plans. The Disability Plans were discontinued upon termination of the Medical Plans on December 21, 2008. Accordingly, the Employees have no entitlement to benefits under the Disability Plans as of December 21, 2008.

### Life and AD&D Insurance

104.    The Debtors provide accidental death and dismemberment coverage ("AD&D Insurance") through The Lincoln Financial Life Insurance Company ("Lincoln Financial") to all salaried Employees in an amount of up to two times an Employee's annual salary.

105.    The Debtors also provide life insurance benefits to all salaried Employees through Lincoln Financial in the amount of two times the Employee's basic annual earnings or a flat rate (the "Life Insurance"). The Debtors' premium payments for Life Insurance and AD&D Insurance, inclusive of any administrative fees owed (together, the "Insurance Premiums")

41

aggregated approximately $12,804.27 per month, inclusive of supplemental insurance premiums paid by the Employees to the Debtors to obtain additional life insurance coverage.[10]

106.  The Debtors estimate that they may owe up to $25,000 in unpaid prepetition premiums on account of unpaid Insurance Premiums. The Debtors seek authority to pay any prepetition Insurance Premiums up to a total amount of $25,000 and to continue to pay their Insurance Premium contribution obligations incurred postpetition with respect to the Remaining Employees in the ordinary course of the Debtors' business.

(4)     Paid Time Off

107.  The Debtors have various policies whereby Employees are permitted to take paid time off for jury duty, bereavement leave, military duty and sick leave (collectively, the "Paid Time Off").

108.  The Debtors provide Employees with Paid Time Off under the following conditions: (i) Employees fulfilling jury duty are reimbursed for the difference between the Employee's regular pay and the earnings received from the court; (ii) Employees taking time off due to a death in their immediate family receive three days' regular pay; (iii) Employees serving time in the military are eligible for the difference between the Employee's regular pay and the earnings received from the military for up to two weeks in any calendar year (Employees engaged in a long term military leave of absence are granted an unpaid leave); and (iv) Employees who are not Union Employees are eligible for up to five days' regular pay in the

---

[10] Employees may purchase supplemental life insurance up to five times their annual salary. Employees who purchase supplemental life insurance pay the total cost of the premiums in connection therewith. Such cost varies based upon the Employee's age and gender.

42

event of an illness of the Employee, while certain Union Employees are entitled to Paid Time Off for time spent at medical appointments.

109.    The Debtors seek authority to honor their existing Paid Time Off policies, in their discretion, to permit Remaining Employees to use their prepetition accrued Paid Time Off in the ordinary course of business and to honor similar Paid Time Off policies on a postpetition basis and in the ordinary course of the Debtors' business. The Debtors historically have not cashed out Paid Time Off and do not seek to cash out Paid Time Off pursuant to the motion.

(5)    Holidays and Vacation

110.    The Debtors observe twelve paid holidays throughout the year, including federal holidays and two floating holidays (collectively, the "Holidays"). Full-time Employees who work on a Holiday are paid for the Holiday at two and one-half times their regular rate. Union Employees who worked on a Holiday were paid for the Holiday at one and one-half times their regular rate.

111.    Employees accrue vacation time based on length of service ("Vacation Time"). Specifically, all regular, full-time, salaried Employees who are not Union Employees earn: (a) two weeks of vacation as of January 1 in their second calendar year of employment during the first four years of service; (b) three weeks of vacation as of January 1 after five years of service; (c) four weeks of vacation as of January 1 after fifteen years of service; and (d) five weeks of vacation as of January 1 after twenty years of service. During the first year of

43

employment, Vacation Time is based on months of service. Vacation Time must be used in the year it is accrued and may not be carried over to the next year.

112.  After a probationary period, Union Employees earned Vacation Time at the following rates: (a) one week of vacation after one year of employment; (b) two weeks of vacation after five years of employment; and (c) three weeks of vacation after ten years of employment. Vacation Time for Union Employees accrued as of July 1.

113.  Employees are paid as vacation days are taken. Vacation Time is to be taken within the calendar year it is granted. Employees whose employment with the Debtors is terminated receive payment for accrued Vacation Time minus any vacation already taken in that calendar year.

114.  As of the Petition Date, the Debtors believe that Employees have approximately $973,946.36 of accrued but unused Vacation Time, which would have been used or paid out to Employees in the ordinary course of business. Of that amount, approximately $110,811.82 consists of Vacation Time (the "California Vacation Time") accrued by Terminated Employees in California (the "Terminated California Employees"). The Debtors request authority, in their discretion, to pay the Terminated California Employees up to an aggregate amount of $111,000 on account of the accrued California Vacation Time, and to allow Remaining Employees to use (but not cash out) their accrued Vacation Time in the ordinary course of business.

(6)  401(k) Plans

44

115. Salaried Employees working at all facilities (Bowling Green, KY, Manchester, TN, Russellville, AL and Santa Ana, CA) and hourly employees working at the Manchester, TN facility are eligible to contribute to a 401(k) retirement plan administered by Merrill Lynch, Pierce, Fenner & Smith Incorporated (the "Merrill Lynch 401(k) Plan"). Hourly Employees working at the Santa Ana, CA and Russellville, AL facilities are eligible to contribute to a 401(k) retirement plan administered by John Hancock (the "John Hancock 401(k) Plan" and, together with the Merrill Lynch 401(k) Plan, the "401(k) Plans"). Salaried Employees are eligible to contribute to the 401(k) Plans beginning March 1 or September 1 following six full months of service. Employees may contribute to the 401(k) Plans up to maximum amounts allowed under IRS guidelines. For the Merrill Lynch 401(k) Plan, the Debtors match 100% for the first 1% of the Employee's contribution and 50% for each additional contribution percentage point up to 6%. For the John Hancock 401(k) Plan, the Debtors match 1 ½ % of an Employee's contribution up to 3%.

116. The Debtors estimate that, as of the Petition Date, no 401(k) contributions from Employees or matching contributions remain unremitted, other than as part of Wages described above. The Debtors owe Merrill Lynch approximately $1,000 in prepetition administrative fees (the "401(k) Plan Administration Fees"), and accordingly seek authority to pay $1,000 to Merrill Lynch for the payment of the 401(k) Plan Administration Fees. The Debtors further request authority, in their discretion, to continue their existing 401(k) Plans, including the ability, in their sole discretion, to continue to make matching postpetition

45

contributions under the 401(k) Plans for the Remaining Employees in the ordinary course of the Debtors' business and pay associated administration fees in connection therewith.

(7)     Union Pension Plan

117.     DESA Heating LLC ("DESA Heating") sponsors the Industrial Pension Plan (the "Union Pension Plan") for the benefit of Union Employees pursuant to the terminated Collective Bargaining Agreements.  In November 2008, DESA Heating contributed the minimum amount of $246,441 as required by applicable law.  For normal retirement, a Union Employee's pension benefit is fully vested after 5 years of employment.  The Debtors are not requesting authority to fund any prepetition amounts under the Union Pension Plan pursuant to the motion.

Workers' Compensation

118.     Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtors.  The Debtors currently maintain several annual workers' compensation policies (the "Workers' Compensation Policies") with National Union Fire Insurance Company of Pittsburgh, PA and Illinois National Insurance Co. (collectively, the "Workers' Compensation Insurers") pursuant to which the Workers' Compensation Insurers provides workers' compensation insurance coverage up to $1,000,000 per occurrence, with a $350,000 deductible per claim, for employer liability for the states in which the Debtors' Employees reside.  The current terms of the Workers' Compensation Policies

46

run through October 1, 2009, and cost an estimated total of approximately $244,446 on an annual basis.

119.     The Debtors believe that they may owe up to $10,307.34 for the prepetition insurance premiums for the month of December 2008 (the "Workers' Compensation Premium Payments"), and seek authority to make such payments up to $11,000. The Debtors also seek authority to maintain their workers' compensation and other liability insurance in accordance with applicable law postpetition for the benefit of Remaining Employees, and to pay all premium installments as they come due in the ordinary course of business.

Bonus Program

120.     Prepetition, the Debtors offered incentive programs for certain management-level Employees (the "Management Bonus Programs") pursuant to which such Employees are eligible to receive bonuses based on performance metrics defined for EBITDA and working capital. Employees who satisfy their respective targets under the Management Bonus Program and continue to be employed at the end of the respective fiscal year are entitled to receive a bonus. With the exception of bonuses due for the fiscal year ending March 2008,[11] in the ordinary course of the Debtors' business, bonuses under these programs are paid following the completion of an audit for the respective fiscal year. For the fiscal year ending February 2009, 25 Employees are eligible to receive a total of $946,952, which amount is contingent upon EBITDA and working capital performance during this fiscal year. As of the Petition Date, the Debtors estimate that bonuses in the amount of approximately $188,648 for seven Employees

---

[11]  As of the Petition Date, $517,024 in earned bonuses for 15 Employees for the fiscal year ending March 1, 2008 remained unpaid.

have accrued based on their year to date performance through November 2008. The Debtors do not seek authority to pay any prepetition bonuses pursuant to the motion, but reserve the right to seek approval of such programs pursuant to a separate motion filed with the Court.

Miscellaneous Benefit Programs

Tuition Reimbursement Program

121.    The Debtors offer additional benefits to Employees including a program by which the Debtors reimburse eligible Employees employed for at least one year for tuition, books and school fees for approved courses in which the Employees receive a grade of "C" or better (the "Tuition Reimbursement Program"). The Debtors estimate that they owe up to $9,208 on account of prepetition reimbursement obligations in connection with the Tuition Reimbursement Program (the "Tuition Reimbursement Amounts"). The Debtors seek authority, in their discretion, to pay the Tuition Reimbursement Amounts that may be owed under the Tuition Reimbursement Program up to $10,000. The Debtors do not seek authority to continue the Tuition Reimbursement Program on a postpetition basis.

Car Allowances

122.    The Debtors' business requires certain Employees to travel substantial distances in connection with fulfilling their job duties. Accordingly, the Debtors provide such Employees with car allowances (the "Car Allowances") that are treated as income for such Employees. The Debtors pay approximately 16 Employees a Car Allowance on a monthly basis. The Debtors estimate that the amount of prepetition unpaid Car Allowances (the "Car Allowance Amount") is approximately $12,550. The Debtors seek authority to pay the Car Allowance

48

Amount up to $13,000 due as of the Petition Date, and to continue providing Car Allowances only to sales personnel in their sole discretion on a postpetition basis in the ordinary course of business. The Debtors are terminating Car Allowances for management as of the Petition Date.

123.    I believe that performing the foregoing obligations is essential and appropriate under the circumstances and applicable law in order to minimize the personal hardship to the Employees as a result of the filing of these Chapter 11 Cases, and to minimize the disruption to the Debtors' business, for the benefit of the Debtors' creditors and their estates. Accordingly, I respectfully submit that the relief requested in the above-referenced motion should be granted by the Court.

**M.      Debtors' Motion for Order Under 11 U.S.C. §§ 105, 363, 503(b), 1107 and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System, (IV) Providing Administrative Priority Status to Postpetition Intercompany Claims and (V) Waiver of Section 345(b) Deposit and Investment Requirements**

124.    The Debtors seek authorization (1) to maintain their existing bank accounts and to pay any prepetition routine banking fees imposed by the debtors' financial institutions where the bank accounts are maintained, (2) to continue to use their existing business forms, (3) to continue to use their existing cash management system, (4) to provide administrative priority to postpetition intercompany claims, and (5) of a waiver of the deposit and investment guidelines imposed under section 345(b) of the Bankruptcy Code.

Bank Accounts/Cash Management System

125.    The Debtors' cash management system (the "Cash Management System") is an integrated network of bank accounts that facilitates the timely and efficient collection,

49

concentration management and disbursement of funds used by the Debtors. The Debtors have maintained a centralized integrated cash management system, with the changes described below, since December 2002. All of the Debtors' bank accounts (the "Bank Accounts") are maintained with US Bank, through US Bank's branch in Bowling Green, Kentucky.[12]

126.     Collections and Deposits.  The Debtors derive revenues primarily from the payment by customers for products purchased from the Debtors.  Virtually all revenues derived from the Debtors' United States operations are directed, if paid by check, into a single lockbox account maintained by the Debtors at US Bank (the "Lockbox Account"), and, if paid by wire transfer, directly to the Concentration Account (as defined below).  The Lockbox Account is a zero balance account.  At the end of each business day, all funds deposited into the Lockbox Account are swept into a concentration account maintained at US Bank (the "Concentration Account").  At the end of each day, after the sweep of funds from the Concentration Account to the GE Segregated Lenders Account, described below, the balance is typically $0.

127.     GE Lenders Segregated Account.  Funds in the Concentration Account are swept daily into an insured money-market account (the "GE Lenders Segregated Account") maintained at LaSalle Bank, Chicago, Illinois, in the account name of GE Business Financial Services Inc. (f/k/a Merrill Lynch Business Financial Services Inc.) (the "Prepetition Senior Agent"), as agent for the Debtors' prepetition senior lenders (the "Prepetition Senior Lenders").[13]

---

[12] The Debtors' foreign, non-debtor affiliates also have bank accounts, which have been frozen and currently are not part of the Debtors' cash management system.  The Debtors currently receive no funds from, nor do they transfer funds to, such foreign, non-debtor affiliates' accounts.

[13] The GE Lenders Segregated Account was established when the Prepetition Senior Agent exercised its rights under a blocked account agreement with the Debtors in March, 2008.  Prior to that exercise, amounts in excess of $100,000 in the Concentration Account were swept daily into an investment account, now also dormant, maintained by the Debtors at US Bank.

50

Funds in the GE Lenders Segregated Account are transferred on request by the Debtors on a weekly basis to the CRO approved budget Disbursement Account (described below), when the Debtors balance in the CRO approved budget Disbursement Account is not sufficient to fund the Debtors' requests for transfers to the Disbursement Accounts.[14]

128. <u>Disbursements</u>. Disbursements are funded on request of the Debtors from the GE Lenders Segregated Account into the CRO approved budget disbursement account, one of three (3) disbursement accounts (collectively, the "Disbursement Accounts"), each of which also is maintained at US Bank. The CRO approved budget Disbursement Account was established by the Debtors shortly before the Petition Date. Payroll is funded from the CRO approved budget Disbursement Account into the Debtors' master payroll account, and from that account into two (2) subaccounts, one for California employees and the other for non-California employees. The Debtors' payroll obligations are funded directly from those subaccounts. Medical benefits obligations are funded from the CRO approved budget Disbursement Account to the medical benefit Disbursement Account, and are paid from that Disbursement Account. The Debtors' other accounts payable, including trade, are paid directly from the CRO approved budget Disbursement Account. Such other accounts payable were previously paid from a fourth Debtors' Disbursement Account, which is now dormant. The Debtors propose to continue using the Disbursement Accounts, other than the fourth Disbursement Account as described in the motion, after the Petition Date.

---

[14] Pursuant to the interim and final cash collateral orders proposed to be entered in these Chapter 11 Cases, funds in the GE Lenders Segregated Account are not applied in reduction of the indebtedness of the Debtors' to the Prepetition Senior Lenders except by order of this Court.

129.     The Debtors seek a waiver of the United States Trustee's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened at depositories authorized by the United States Trustee.  If strictly enforced in this case, the United States Trustee's requirement would disrupt the Debtors' activities and would impair the Debtors' ability to operate under chapter 11.  Maintenance of the Bank Accounts will greatly facilitate the Debtors' operations in chapter 11.  As noted above, virtually all payments by check from the Debtors' customers are deposited into the Lockbox Account, and payments by wire transfer from such customers are made directly to the Concentration Account.  On the disbursement side, the Debtors are already set up to make payments including to their suppliers of goods and services, and for payroll and medical benefits, from the Disbursement Accounts.  If the Bank Accounts were closed, the Debtors would have to open new accounts and then attempt to coordinate alternative arrangements with their customers and vendors, which could well disrupt the flow of the Debtors' receipt of sales revenues and the Debtors' payment of debts incurred postpetition.  Such a disruption would severely and adversely affect and could irreparably harm the Debtors' postpetition operations.

130.     Further, the Debtors seek authority to continue to use their Cash Management System, as such system may be modified pursuant to the requirements of any Court-approved debtor in possession financing facility and/or cash collateral usage and related orders of this Court.  The Debtors' Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtors in the exercise of their business judgment.  The widespread use of this particular Cash Management System,

52

moreover, is attributable to the numerous benefits it provides, including the ability to (a) process and timely pay expenses; (b) ensure cash availability; (c) control and monitor corporate funds; and (d) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System will facilitate and enhance the Debtors' efforts to continue to operate postpetition.

Business Forms

131. Additionally, in order to change their existing business forms and checks, the Debtors must discard all its existing stock of checks and forms and replace them. None of the Debtors' checks or forms is computer generated. Rather, as described below, the Debtors have significant existing stock of pre-printed forms such as letter-head, and envelopes, brochures, and pamphlets. The Debtors also have significant paper stock of checks for both payroll and medical benefits. Replacing all of these would require the purchase of new documents, imprinted with both the term "Debtor in Possession" and the case number. Thus, the new stock could not be ordered until after the case commenced, and would not be available for some time. In the interim, the Debtors would be without essential business forms and checks. The Debtors therefore request a waiver of the requirements to change their existing business forms and checks until their current stock is exhausted.

132. Check Stock. The Debtors currently have approximately 1.5 months of payroll and benefits check stock on hand. It will cost approximately $2,000.00 for a six month

53

supply, and will take a minimum of two weeks to have it delivered. This check stock is tailored for the Debtors' accounting software, and can only be purchased through certain vendors, and is subject to paper stock availability on the vendor side. Compelling the Debtors to replace all this check stock would mean that the Debtors would not be able to pay invoices by check for approximately two weeks.

133. <u>Invoice Forms</u>. The Debtors currently have approximately one month of invoice forms on hand, and estimate that it would take about two weeks to replace the existing stock at a cost of several thousand dollars for a three-month supply. Compelling the Debtors to replace their existing stock of invoice forms would significantly impede the Debtors' abilities to bill and collect payment from their customers for weeks.

134. <u>Letter Head/ Envelopes</u>. The Debtors currently have about one month stock of letter head and envelopes on hand, and estimate that it will take one week to replace them at a cost of approximately $2,000.00. These supplies are used daily in the Debtors' operations, and while not as essential as the business forms or checklists described above, compelling the Debtors to replace their existing stock would impede operations until they are replaced.

<u>Intercompany Transfers</u>

135. As described above, under the Cash Management System, funds generated by the business operations of the Debtors flow into a two centrally-maintained Bank Accounts, the Lockbox Account and the Concentration Account. Prior to the Petition Date, the Debtors, among themselves, engaged in intercompany financial transactions in the ordinary course of their

54

businesses (collectively, the "Intercompany Transactions"). Postpetition, these Intercompany Transactions will be recorded on the applicable Debtor's general ledger as an intercompany payable, receivable or loan. All of these Intercompany Transactions are made between and among certain Debtors in the ordinary course of the Debtors' business as part of their consolidated Cash Management System.

136. At any given time, there may be balances due and owing from one Debtor to another Debtor and between the Debtors. These balances represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System. Postpetition, the Debtors will maintain records of these transfers of cash and can ascertain, trace and account for these Intercompany Transactions and will continue to maintain such records, including records of all current intercompany accounts receivable and payable, during the pendency of these cases.

137. To ensure each individual debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims against a debtor by another debtor arising after the Petition Date as a result of ordinary course intercompany transactions through the Cash Management System (collectively, "Intercompany Claims"), be accorded administrative priority expense status. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

55

<u>Section 345(b) Waiver</u>

138.    Lastly, tThe Debtors seek a waiver of section 345(b) of the Bankruptcy Code. The waiver would permit the Debtors to maintain their Bank Accounts without posting a bond or other security. As explained above, under the Cash Management System, each day all funds are deposited into the Lockbox Account or the Concentration Account. Funds are transferred, if necessary, into the Disbursement Accounts only in the amounts necessary to for the Debtors to make their required disbursements from those accounts pending the checks for such disbursements being honored. In this case, therefore, because no Bank Account will ever hold a substantial amount for an extended period, the risk of loss is minimal. Finally, all of the Bank Accounts are maintained at US Bank, which I understand to be a federally insured institution, and the aggregate sum of the balances in all of the Bank Accounts is not expected to exceed a minimal aggregate amount at any time postpetition following the daily sweeps from the Lockbox Account to the Concentration Account, and from the Concentration Account to the GE Segregated Lenders Account. Further, after the Petition Date, the Debtors will present to US Bank a collateralization agreement approved by the United States Trustee with respect to collateralizing the Bank Accounts.

139.    Based on the foregoing reasons, I believe that the relief sought by the above-referenced motion is critical and in the best interests of the Debtors and their estates, and accordingly should be granted.

**N.      Motion for Order Under 11 U.S.C. §§ 105(a) and 366
(a) Prohibiting Utilities from Discontinuing, Altering
or Refusing Service, and (b) Establishing Procedures
<u>for Determining Adequate Assurance of Payment</u>**

DOCS_NY:17219.9

140.     The Debtors request the entry of interim and final orders: (a) prohibiting the Utility Providers (defined below) from altering, refusing or discontinuing service; (b) deeming the Utility Providers adequately assured of future performance; and (c) establishing procedures for determining additional adequate assurance of future payment.

141.     In the normal course of business, the Debtors have relationships with approximately twelve (12) utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision of telephone, gas, electricity, water and sewer and related services (the "Utility Services") for 40 separate accounts.  The Utility Providers include, without limitation, the entities set forth on the list attached to the motion as Exhibit A.  The Debtors estimate that their average monthly payments to the Utility Providers aggregate approximately $213,634.89.

142. The Debtors cannot continue to operate without continued Utility Services. If any of the Utility Providers alter, refuse or discontinue service, even for a brief period, the Debtors business operations would be severely disrupted. In contrast, the Utility Providers will not be prejudiced by the continuation of their services and will be paid all postpetition utility charges. It is therefore critical that Utility Services continue uninterrupted.

143. Accordingly, in order to provide adequate assurance of payment for future services to the Utility Providers, the Debtors propose to make a deposit (a "Utility Deposit") equal to 50% of the Debtors' estimated cost of its monthly utility consumption to each Utility which the Debtors intend to continue to utilize during the course of these cases. The Debtors estimate that the Utility Deposits, in the aggregate, will total approximately $106,817.45. The Debtors propose to make Utility Deposits to each of the Utility Providers within ten (10) days after the entry of an interim order granting this Motion, pending further order of the Court, for the purpose of providing each Utility Provider with adequate assurance of payment of its postpetition date services to the Debtors.

144. In addition, the Debtors seek to establish reasonable procedures (the "Procedures") by which a Utility Provider may request additional adequate assurance of future payment, in the event that such Utility Provider believes that its Utility Deposit does not provide it with satisfactory adequate assurance. Such Procedures, in particular, would provide that:

a. If a Utility Provider is not satisfied with the assurance of future payment provided by the Debtors pursuant to the proposed Utility Deposit, the Utility Provider must serve a written request (the "Request") upon the Debtors setting forth the location(s) for

58

which Utility Services are provided, the account number(s) for such location(s), the outstanding balance for each account, a summary of the Debtors' historical amounts incurred with respect to utility use over the course of the last 12 months for each account, and an explanation of why the Utility Deposit is inadequate assurance of payment;

        b.      The Request must be actually received by the Debtors and Debtors' counsel within forty-five (45) days of the date of the interim order granting this Motion (the "Request Deadline");

        c.      Without further order of the Court, the Debtors may enter into agreements granting additional adequate assurance to a Utility Provider serving a timely Request, if the Debtors, in their discretion, determine that the Request is reasonable;

        d.      If the Debtors believe that a Request is unreasonable, then the Debtors shall, within thirty (30) days after the Request Deadline date, file a motion pursuant to section 366(c)(2) of the Bankruptcy Code (a "Determination Motion"), seeking a determination from the Court that the Utility Deposit, plus any additional consideration offered by the Debtors, constitutes adequate assurance of payment. Pending notice and a hearing on the Determination Motion, the Utility Provider that is the subject of the unresolved Request may not alter, refuse, or discontinue services to the Debtors nor recover or setoff against a pre-petition date deposit; and

        e.      Any Utility Provider that fails to make a timely Request shall be deemed to be satisfied that the Utility Deposit provided to it constitutes adequate assurance of payment.

DOCS_NY:17219.9

145.    I believe that the relief requested by the Debtors in the above-referenced

motion is necessary to avoid interruptions in their business operations and will not prejudice the

Utility Providers.  Accordingly, I respectfully submit that such relief should be granted by the

Court.

**O.    Motion of the Debtors for an Order Providing That Creditors' Committees Is Not Authorized or Required to Provide Access to Confidential Information of the Debtors r to Privileged Information**

146.    The Debtors seek the entry of an order by the Court confirming that

section 1102(b)(3)(A) of the Bankruptcy Code does not authorize or require any Creditors'

Committee appointed in these Chapter 11 Cases to provide access to the Debtors' Confidential

Information[15] to any creditor that such committee represents.  Furthermore, the Debtors seek

entry of an order clarifying that any Creditors' Committee is not authorized or required to

provide access to Privileged Information[16] to any creditor that such Creditors' Committee

represents.  I believe that the relief requested will help ensure that confidential, privileged,

proprietary and/or material non-public information will not be disseminated to the detriment of

the Debtors' estates and will aid the Creditors' Committee in performing its statutory function.

---

[15] The term "Confidential Information" shall mean any nonpublic information of the Debtors, including, without limitation, information concerning the Debtors' assets, liabilities, business operation, projections, analyses, compilations, studies, and other documents prepared by the Debtors or their advisors or other agents, which is furnished, disclosed, or made known to the Creditors' Committee, whether intentionally or unintentionally and in any manner, including written form, orally, or through any electronic, facsimile or computer-related communication.  Confidential Information shall include (a) any notes, summaries, compilations, memoranda, or similar written materials disclosing or discussing Confidential Information; (b) any written Confidential Information that is discussed or presented orally; and (c) any other Confidential Information conveyed to the Creditors' Committee orally that the Debtors or their advisors or other agents advise the Creditors' Committee should be treated as confidential.  Notwithstanding the foregoing, Confidential Information shall not include any information or portions of information that: (i) is or becomes generally available to the public or is or becomes available to the Creditors' Committee on a non-confidential basis, in each case to the extent that such information became so available other than by a violation of a contractual, legal, or fiduciary obligation to the Debtors; or (ii) was in the possession of the Creditors' Committee prior to its disclosure by the Debtors and is not subject to any other duty or obligation to maintain confidentiality.

[16] The term "Privileged Information" shall mean any information subject to the attorney-client or some other state, federal, or other jurisdictional law privilege (including attorney work product), whether such privilege is solely controlled by the Creditors' Committee or is a joint privilege with the Debtors or some other party.

Accordingly, I respectfully submit that the relief requested in the above-referenced motion should be granted by the Court.

## CONCLUSION

147.     In order to minimize any loss of value to their businesses, the Debtors' immediate objective is to engage in business as usual following the commencement of these Chapter 11 Cases with as little interruption to the Debtors' operations as possible. I believe that if this Court grants the relief requested in each First Day Motion, the prospect of achieving these objectives, to the maximum benefit of creditors, parties in interest, and the Debtors' estates will be substantially enhanced.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

DOCS_NY:17219.9

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 29, 2008

Craig S. Dean
Chief Restructuring Officer

# EXHIBIT A

DESA
NEW LEGAL ENTITY STRUCTURE
as of 08/29/07

